622 So.2d 456 (1993)
Ronald Lee WILLIAMS, Appellant,
v.
STATE of Florida, Appellee.
No. 78249.
Supreme Court of Florida.
April 22, 1993.
Rehearing Denied July 1, 1993.
*458 Spiro T. Kypreos, Court-Appointed Atty., Pensacola, for appellant.
Robert A. Butterworth, Atty. Gen. and Carolyn M. Snurkowski, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Ronald Lee Williams appeals his convictions of four counts of first-degree murder, one count of attempted first-degree murder, and six counts of armed kidnapping, and his corresponding sentences, including a sentence of death. We have jurisdiction[1] and affirm his convictions. We also affirm the trial judge's override of the jury's life recommendation and his imposition of the death penalty. Because the enhancement factors were not properly established, we must vacate Williams' concurrent life sentences for the attempted murder and kidnapping convictions, and remand this cause with instructions that he be sentenced to concurrent thirty-year terms.
The evidence establishes that Williams ran a drug trafficking ring from Miami that extended from Miami to Pensacola. In September of 1988, Bruce Frazier, who oversaw Williams' Pensacola operation, became concerned that his ex-girlfriend would alert the police to the drug ring. Bruce Frazier and Michael McCormick, a street-level employee, moved a safe containing cocaine and money from one of the apartments used in the drug business to Michael McCormick's apartment. During a telephone conversation, Williams told Bruce Frazier to go to McCormick's apartment to obtain other money that McCormick owed Williams. Upon reaching the apartment, McCormick informed Bruce Frazier that the money he owed Williams and the safe they had just moved from Bruce Frazier's apartment had been stolen. Bruce Frazier called Williams and informed him of the situation and the fact that there were no visible signs of a forced entry into McCormick's apartment. Bruce Frazier testified that Williams allegedly stated that he was sending some people up to Pensacola to get the money and drugs back.
On September 19, 1988, Williams sent Timothy Robinson, Bruce Frazier's brother Darrell Frazier, and Michael Coleman from Miami to Pensacola to begin a search for the missing cocaine and money. These individuals met McCormick and Bruce Frazier at a hotel in Pensacola and went to McCormick's apartment. After obtaining several weapons from McCormick, they went to the apartment next door and forced their way in. In the apartment were Darlene Crenshaw, Amanda Merrill, Derek Hill, and Morris Alfonso Douglas. Mildred Baker, McCormick's girlfriend, was brought in shortly thereafter. Hill, Merrill, Baker, and Douglas were ordered to take their clothes off. They were then bound and gagged, and made to lie on the floor. The four men then began interrogating the prisoners. After his demands regarding the whereabouts of the money and cocaine went unanswered, Robinson began stabbing Hill. Meanwhile, the other accomplices physically assaulted some of the other hostages with kitchen knives found in the apartment.
At this point, Darlene Crenshaw stated that she knew where the stolen contraband was and that McCormick was involved in the theft. After Crenshaw's revelation, McCormick was also stripped, tied up, and stabbed several times. The Fraziers took Crenshaw to her apartment where they retrieved the cocaine and cash. The Fraziers left Crenshaw at her apartment and returned to Hill's apartment.
Meanwhile, at Hill's apartment, Mildred Baker and Amanda Merrill were repeatedly raped by Robinson and Coleman. The men were apparently stabbed and slashed several more times. Once the Frazier brothers returned, Coleman and Robinson systematically began killing the prisoners. All of the prisoners except Merrill died at the scene. Coleman first slashed Merrill's throat several times. Someone then shot Merrill in the back of the head. After the men left, Merrill was miraculously able to free herself and call 911.
*459 At the trial, Darlene Crenshaw, Amanda Merrill, and Bruce and Darrell Frazier testified for the State. It was undisputed that Williams was in Miami at the time the crimes were committed and did not shoot or stab any of the victims himself.
Darlene Crenshaw testified that Hill and Douglas had taken the safe, left it at her house, and returned on the morning of September 19, 1988, in order to open it. A portion of the money and drugs in the safe was left at her house. She testified that, later that evening while she was at Hill's apartment with Merrill, Douglas, and Hill, three armed men forced their way into the apartment and demanded the return of their "stuff." A fourth man brought in Mildred Baker a few minutes later. Crenshaw stated that one of the Fraziers kept demanding his "stuff." After telling the Fraziers that she knew where the money and drugs were, she was allowed to dress. On the way to her house, one of the Fraziers stated that he only wanted his "stuff" and that Crenshaw would not be hurt. One of the Fraziers then allegedly stated that he would "take care of the guys." She testified that, once they had located the stolen contraband, the Fraziers left her at her house.
Amanda Merrill testified that after Crenshaw had been taken away by the Fraziers, Robinson began physically and verbally abusing Douglas and Hill, and that she was repeatedly raped. She testified that soon thereafter she heard someone come into the apartment and say, "We got what we want. Come on, let's go." She stated that another person then said, "No, I'm going to do this." Merrill then stated that she heard a gunshot and heard Mildred Baker begging not to be killed. She stated that she heard Robinson say, "Get down, bitch," and that a shot rang out. Coleman then entered the room and cut Merrill's throat. Coleman later cut her throat two more times. Finally, she stated that someone entered the room and shot her in the back of the head.
Bruce Frazier testified that in February, 1988, he established a drug operation for Williams in Pensacola. He rented an apartment where he kept a safe containing money and drugs. He testified that the entire episode began when he suspected that his ex-girlfriend would alert the police to the operation. Bruce Frazier testified that, after going to McCormick's apartment, they went next door and forced their way in. Frazier also stated that, as he and Darrell were leaving with Darlene Crenshaw, Robinson told him to "kill the girl" if the police got behind them. He testified that, upon returning to McCormick's apartment, he saw a girl lying on the bed with her throat cut and Derek Hill lying on the floor with his throat cut, and that McCormick had been stabbed in the back. Bruce Frazier testified that his brother Darrell stated that they had gotten what they came for. Robinson commented that they had one more thing to take care of before they left. Bruce Frazier stated that Coleman then shot McCormick in the head. Bruce stated that he then left the apartment, followed shortly afterwards by his brother Darrell. Bruce Frazier explained that, at this point, he heard two more shots and then saw Coleman and Robinson leave the apartment. He testified that, upon returning to Miami, he met with Williams, Darrell Frazier, and Gwen Cochran; that Cochran stated that she could be charged as an accessory to murder; and that Williams replied that he could "get the most time" because he ordered the people to be killed. Bruce Frazier concluded his testimony by stating that his intent had been to merely investigate the theft, and get the money and drugs back.
Darrell Frazier testified that, during the several days prior to the murders, he, Williams, Coleman, and Robinson met several times to discuss the theft and at one meeting Williams stated that, if McCormick was involved with the theft, he should be "dropped." Darrell Frazier testified that Williams ordered them to "drop" whoever was involved with the theft of his money and drugs. Darrell also testified that, after returning from Crenshaw's house, he told Robinson, "Let's go man. We got what we came for," and that Coleman responded "No, man, the nigger told us we *460 got to drop them, man." Darrell testified that, upon being advised that Crenshaw had been released, Williams told Darrell that he had "fucked up. [He] shouldn't have did that." Darrell Frazier also stated that, upon returning to Miami, Williams paid him, Robinson, and Coleman $9,000 each and paid Bruce Frazier $3,000.
During the trial, the State introduced evidence pertaining to two drive-by shootings that occurred in Jacksonville several months before the incident in Pensacola. Bruce Frazier testified that, in 1988, Vernon McClendon, an employee from whom Williams rented a house where drugs were sold, decided to end his association with Williams and start his own drug operation. Bruce Frazier stated that McClendon had not taken anything that belonged to Williams but that, nevertheless, Williams decided that McClendon should be killed. Frazier further testified that he, Williams, Timothy Robinson, and Kelvin McKinney traveled to Jacksonville, bought several automatic weapons with Williams' money, and attempted to kill McClendon and his girlfriend, Honey Rose Hurley. Frazier testified that Williams had ordered that they kill McClendon. Another witness, Rufus Williams, testified that Ronald Williams had ordered them to "drop" McClendon in order to avoid competition. Frazier testified that, as Hurley approached a toll booth, he pulled alongside her car and Robinson shot her several times. They also shot McClendon in a similar drive-by fashion.
The jury, at the conclusion of the guilt phase, found Ronald Williams guilty as charged.
At the penalty phase, the State relied on the testimony presented during the guilt phase of the trial. The defense presented the testimony of five witnesses. Eartha Copeland, a seventy-year-old friend of Williams' family, testified that she had known Williams since he was a child and that he came from a good and loving family. Alfred Wright, Williams' cousin, testified that he had grown up with Williams in Vidalia, Georgia, and that Williams had never been in trouble with the law before moving to Miami. John Morris, a friend of Williams' family, testified that Williams had been kind to him in the past. Morris asked that Williams' life be spared. In spite of the fact that Michael McCormick, one of the victims, was the father of her children, Shirley Williams, the defendant's sister, testified that Williams was a very gentle and kindhearted person, who never did anything disruptive in his entire life. Williams' mother, Louise Williams, stated that Williams had had a normal childhood, was compassionate with his siblings, and helped his family as much as he could. The jury recommended a life sentence.
Darrell Frazier was originally convicted and sentenced to death. However, the trial judge subsequently reduced Darrell Frazier's sentence to life imprisonment for his substantial assistance to the prosecution in Williams' conviction. Timothy Robinson and Michael Coleman were also found guilty and sentenced to death for their participation in this incident. We have affirmed both of their convictions. Robinson v. State, 610 So.2d 1288 (Fla. 1992); Coleman v. State, 610 So.2d 1283 (Fla. 1992).
The trial judge adjudicated Williams guilty of four counts of first-degree murder, one count of attempted first-degree murder, and six counts of kidnapping. In his sentencing order, the trial judge found the following aggravating circumstances: 1) Williams was previously convicted of another capital felony  the murder of the other three victims  or of felonies involving the use or threat of violence; 2) the murders were committed while Williams was an accomplice in a robbery, sexual battery, burglary, and kidnapping; 3) the murders were committed for the purpose of avoiding arrest; 4) the murders were committed for pecuniary gain; 5) the murders were heinous, atrocious, or cruel; 6) the murders were committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification. While finding that no statutory mitigating factors were present, the trial judge did find the fact that Williams was a loving family member to his son and mother to be a nonstatutory mitigating factor.
*461 The trial judge concluded that the six aggravating factors outweighed the one mitigating factor and sentenced Williams to death. In overriding the jury's recommendation of life, the trial judge stated:
The jury's recommendation of [a] life sentence could have been based only on minor, non-statutory mitigating circumstances or sympathy and was wholly without reason. "In this case the evidence of mitigation is minuscule in comparison with the enormity of the crimes committed... . We agree that virtually no reasonable person could differ as to the appropriateness of the death sentence in this case." Zeigler v. State, [580 So.2d 127, 131 (Fla. 1991)].

Guilt Phase
In the guilt phase of this appeal, Williams claims that the trial court erred in: 1) interrupting the defense's cross-examination of a key state witness without the prosecution's first objecting, thus affirming the witness's credibility; 2) admitting evidence of other crimes occurring in a different locale approximately four months prior to the incident in question; and 3) allowing the State, over a timely objection, to peremptorily challenge a juror solely on the basis of race.
In his first claim, Williams asserts that the trial judge's rebuke of defense counsel's attempts to impeach Darrell Frazier was equivalent to the judge's expressing an opinion that Frazier was testifying truthfully. During the defense's cross-examination, the following colloquy took place:
Q: Ronald Williams told you to go get my stuff back, didn't he?
A: Yes, he did.
Q: He never told you to kill anybody, did he?
A: Yes, he did. He told us to drop them.
Q: Page 57, lines 9 through 10, take a look at that and see if that refreshes your memory about what he told you.
A: Question, "What did Trick tell you?" "Before we got ready to go  before we got ready to go  "
Q: Just this right there.
A: Right there? He said, "Yoge, make sure you get my dope back."
Q: Okay. That's the question I posed to you?
THE COURT: No, it wasn't, Mr. Etheridge. That's not the question you posed. You asked him a follow-up question, too.
THE WITNESS: That's right.
MR. ETHERIDGE: What was my follow-up, Your honor.
THE COURT: You asked him if Mr. Williams asked him to kill anybody, and he said  and he answered 
MR. ETHERIDGE: That was the question, asked him to kill anybody, and he said no, Your Honor. That was the question I followed up on specifically to him.
MR. PATTERSON: Lines 12, 13, and 14, Your Honor.
MR. ETHERIDGE: The State may redirect if they want to, Your Honor. I asked him whether he told him to kill anybody.
MR. PATTERSON: Your Honor, I think that's improper impeachment.
THE COURT: Well, you may proceed, pursue it further, Mr. Patterson. As a matter of the fact, members of the jury, why don't you step out just for a minute and let me handle this outside of the jury's presence. (Jury out.)
THE COURT: Brenda, find those two questions before he attempted to impeach him.
(Portions requested were read by the court reporter.)
THE COURT: Those were your two questions, Mr. Etheridge.
MR. ETHERIDGE: Exactly as I posed them, Your Honor.
THE COURT: No, it's not. You show me in there where you posed them.
MR. ETHERIDGE: No, sir. No, sir. What I'm saying is this, Your Honor. I asked him did Ronald Williams ever ask *462 you to kill anybody. I don't know how much plainer I can make it than how I asked him.
MR. PATTERSON: And he answered it, he said yes.
MR. ETHERIDGE: And then I showed him his different response, Your Honor.
THE COURT: You bring it up to me and you show me where there's a different response, please, sir. I've got a copy here. Give me the Page and the line.
MR. ETHERIDGE: Page 57, lines 9 through 10. And then he said, "Yoge, make sure you get my dope back."
THE COURT: You didn't ask him in the deposition whether on Page 57  you didn't ask him the specific question that you just asked him here, did you?
MR. ETHERIDGE: Your Honor, if I'm out of place, then we can strike the question, have a curative response to the jury and go forward.
THE COURT: Just be careful from here on, Mr. Etheridge. You're doing a very good job representing your client but, let's not distort what is in the record. Ask the jury to come back in.
We disagree with Williams' assertion that the trial judge's statements to defense counsel constituted an improper comment on the witness's credibility. The prosecution asked Frazier if Williams had ever told him to kill anyone. After Frazier answered in the affirmative, defense counsel attempted to impeach him using Frazier's answer to a different question in a deposition. We find the trial judge's actions in these circumstances were proper.
Williams' second claim deals with the admission of evidence regarding two attempted murders in Jacksonville. The state introduced evidence that, approximately four months prior to the Pensacola murders, Williams allegedly sent Bruce Frazier and Timothy Robinson to Jacksonville for the purpose of killing a former employee who had started his own drug business.
Williams argues that the evidence was not Williams rule[2] evidence and that it was introduced to show bad character or Williams' propensity to commit violent acts. The state argues that this evidence was relevant and was introduced to prove Williams' modus operandi in the operation of his drug business. The State asserts that the prosecutor was attempting to establish that, whenever someone attempted to move in on his business, Williams would send his enforcers to kill that person. We find that, given the circumstances of this case, this evidence was properly admitted to show Williams' modus operandi. Alternatively, we find that this evidence was clearly not a focus of the trial and, even if inadmissible, would be harmless error for both the guilt and penalty phases of the trial. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
Williams' third claim is that the trial court erred by allowing the State to peremptorily challenge a juror based solely on the basis of race. During voir dire, the following colloquy took place:
MR. PATTERSON: Judge, I challenge Ms. Rankin peremptorily.
THE COURT: All right. Since she's black, even though there are three other blacks already seated, let me go ahead and ask you to provide a reason for her being stricken.
MR. PATTERSON: I'm glad you did that, Your Honor, because I'm afraid the record might not adequately reflect her responses on the death penalty. As the Court is aware, when I asked her that, about the death penalty, there was a long pause. She shook her head both ways, is my recollection, both no and up and down. I got the distinct impression that she had great trouble pertaining to the discussion about the death penalty, and for that reason I would strike her peremptorily.
MR. ETHERIDGE: Your Honor, I would note for the record that she answered *463 affirmatively when asked by the court whether she could follow the law and apply the law to the facts of this case and, therefore, I don't think it's given a Constitution race neutral issue by the State, which is the second black challenge they've made in this particular case... .
THE COURT: Mr. Patterson is correct. The manner in which she responded was not only dilatory but equivocal. The responses that she ultimately did give were not sufficient under Witherspoon or any of the following cases to constitute sufficient reason to strike her for cause, but certainly her equivocation on the death penalty issue I feel would be sufficient reason for the Court to want to strike her peremptorily, and I'll, therefore, sustain the strike... .
Shortly thereafter, defense counsel moved for more peremptory challenges and the court denied the motion.
Given the prosecutor's stated reasons and the trial court's response, we find that the trial judge did not abuse his discretion in accepting the state's reasons for striking the prospective juror. Files v. State, 613 So.2d 1301 (Fla. 1992). Accordingly, we find no reversible error in regard to the guilt phase of the trial.

Penalty Phase
In the penalty phase of the trial, Williams raises the following three claims: 1) the trial court erred by weighing aggravating circumstances not supported by the record; 2) the trial court erred in overriding the jury's life recommendation and imposing the death sentence; and 3) the sentences imposed upon Williams for the noncapital offenses are illegal.
In his first claim, Williams argues that the trial court erred in finding the following aggravating factors: 1) the murders were committed to avoid or prevent a lawful arrest; 2) the murders were committed for pecuniary gain; 3) the murders were committed in a heinous, atrocious, or cruel manner; and 4) the murders were committed in a cold, calculated, and premeditated manner.
We agree with Williams' assertion that the evidence does not support a finding that the murders were committed to avoid or prevent a lawful arrest. Coleman v. State, 610 So.2d 1283 (Fla. 1992); Robinson v. State, 610 So.2d 1288 (Fla. 1992).
We reject Williams' assertion that the record in this case does not support the trial court's finding that the murders were committed for pecuniary gain. In Thompson v. State, 553 So.2d 153 (Fla. 1989), cert. denied, 495 U.S. 940, 110 S.Ct. 2194, 109 L.Ed.2d 521 (1990), the victim had stolen over one-half million dollars from the defendant. Upon locating the victim, Thompson kidnapped the victim, beat the victim severely in order to ascertain where the money had been hidden, and, after obtaining the answer, shot the victim and dumped his body in the ocean. This Court held that, although there was evidence that Thompson wanted revenge, "it is clear that the purpose of the beatings inflicted in the boat was to prevail upon Savoy to divulge where the money was located." Id. at 156. As in Thompson, the victims in the instant case were bound hand and foot, tortured, and interrogated in an effort to extract from them the location of the stolen drugs and money. We conclude that this aggravating factor is supported by the evidence and note that the finding of this aggravating factor does not conflict with the findings of the aggravating factors previously discussed.
Williams' next argument is that the trial court erred in finding that the heinous, atrocious, and cruel aggravating factor applied to him. While the record reflects that the manner in which the victims were killed was heinous, atrocious, and cruel, the State in this instance failed to prove beyond a reasonable doubt that Williams knew or ordered the particular manner in which the victims were killed. We have expressly held that this aggravating factor cannot be applied vicariously, absent a showing by the State that the defendant directed or knew how the victim would be killed. Omelus v. State, 584 So.2d 563 (Fla. 1991). Consequently, the trial court erred in applying *464 this aggravating factor vicariously. We find that the remaining aggravating factors are fully supported by the evidence.
Williams' last claim is that the trial court erred in overriding the jury's recommendation of life imprisonment and imposing the death penalty. Williams asserts that, given the culpability of Robinson and Coleman, the reduced sentences given the Fraziers, and the fact that Williams was in Miami at the time of the murders, the jury could have reasonably believed that Williams was less culpable than Coleman and Robinson, or equally culpable with the Fraziers. Williams relies on cases such as Downs v. State, 572 So.2d 895 (Fla. 1990), cert. denied, ___ U.S. ___, 112 S.Ct. 101, 116 L.Ed.2d 72 (1991), and Campbell v. State, 571 So.2d 415 (Fla. 1990). We disagree.
Our case law establishes that a trial judge's override of a jury's recommendation of life will be upheld only where the record supports the trial judge's finding that there is no reasonable basis upon which the jury could have based its recommendation. Tedder v. State, 322 So.2d 908 (Fla. 1975). In his sentencing order, the trial judge found:
The jury's recommendation of [a] life sentence could have been based only on minor, non-statutory mitigating circumstances or sympathy and was wholly without reason. "In this case the evidence of mitigation is minuscule in comparison with the enormity of the crimes committed... . We agree that virtually no reasonable person could differ as to the appropriateness of the death sentence in this case." Zeigler v. State, [580 So.2d 127, 131 (Fla. 1991)].
In this case the sentence of death is so clear and convincing that virtually no reasonable person could differ, and a jury override in light of the standard pronounced in Tedder v. State, 322 So.2d 908 (Fla. 1975), would be warranted.
Williams first argues that one reasonable basis for the jury's recommendation of life was in response to the lesser sentences received by the Frazier brothers. We disagree. Even with the elimination of two aggravating factors, "the evidence in this case provides no basis upon which the jury could have recommended life imprisonment in order to prevent disparity in sentencing." Thompson, 553 So.2d at 158. The record unequivocally establishes that Williams was in charge and that he ordered his "enforcers" to recover his drugs and money and to kill anyone involved with the theft. Furthermore, the record also reflects that the Fraziers were less culpable because they disobeyed Williams' orders by allowing Crenshaw to escape and because they did not kill any of the victims.
We also find that Williams' sentence of death is not disparate with the death sentences received by the actual triggermen since he specifically directed them to kill the victims. This was the type of criminal organization, enforcement-style killing in which we have upheld the death sentence. See Antone v. State, 382 So.2d 1205 (Fla.), cert. denied, 449 U.S. 913, 101 S.Ct. 287, 66 L.Ed.2d 141 (1980). This is one of the types of murders to which our death sentence was intended to apply. We find that the trial court's consideration of the two aggravating factors that we found to be inapplicable would not, beyond a reasonable doubt, have affected this sentence and conclude that the trial judge did not err in finding that no reasonable basis existed for the jury's life recommendation. As in Robinson and Coleman, we conclude that, given the circumstances of this case, striking two aggravating factors "does not alter this conclusion because there is no reasonable likelihood that the trial court would conclude that the mitigating evidence outweighed the four valid aggravators." Robinson, 610 So.2d at 1292. The trial court's error, if any, was harmless. Robinson; Coleman; Holton v. State, 573 So.2d 284 (Fla. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991).
We further note that the jury's recommendation could have been based on defense counsel's emotional closing argument, which we find is similar to arguments that we have held "`overstep[] the bounds of proper argument.'" White v. State, 616 So.2d 21, 26 (Fla. 1993) (quoting *465 Taylor v. State, 583 So.2d 323, 330 (Fla. 1991)). We conclude that the trial judge's override was warranted. Francis v. State, 473 So.2d 672 (Fla. 1985), cert. denied, 474 U.S. 1094, 106 S.Ct. 870, 88 L.Ed.2d 908 (1986).
Although not raised in this appeal, we note that the jury instruction given by the trial judge in regard to the heinous, atrocious, or cruel aggravating factor was recently held unconstitutional by the United States Supreme Court in Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). Under the facts of this case, we find that the Espinosa issue was not properly raised before the trial court and, thus, was not properly preserved for appeal. Sochor v. Florida, ___ U.S. ___, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992). Were we to address this issue, we would find that the use of this instruction would constitute harmless error given the record in this case. Melendez v. State, 498 So.2d 1258 (Fla. 1986); State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
Last, we must address Williams' other sentences. We agree with Williams that the life sentences with three-year mandatory minimums for possession of a firearm during the commission of the attempted murder and kidnappings are illegal sentences under our recent court decisions. In order for a defendant's sentence to be enhanced pursuant to section 775.087(1)-(2), Florida Statutes (1991), the State must prove that the defendant had actual physical possession of the weapon. Robins v. State, 602 So.2d 1272 (Fla. 1992); State v. Rodriguez, 602 So.2d 1270 (Fla. 1992). It is undisputed that Williams was in Miami during the commission of the crimes in question. Consequently, the State failed to show that Williams had actual physical possession of a firearm during the commission of the crimes.
Accordingly, we affirm Williams' convictions and sentence of death. We vacate Williams' sentences for kidnapping and attempted murder and remand this case with instructions that he be resentenced to thirty years on each count, to run concurrently.
It is so ordered.
OVERTON, McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
BARKETT, C.J., concurs in result only.
NOTES
[1] Art. V, § 3(b)(1), Fla. Const.
[2] Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).