919 So.2d 347 (2005)
Daniel Ely PEREZ, Appellant,
v.
STATE of Florida, Appellee.
No. SC03-1651.
Supreme Court of Florida.
October 27, 2005.
As Revised on Denial of Rehearing January 5, 2006.
*353 Diamond R. Litty, Public Defender and Gary Lee Caldwell, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, Mitchell Egber and Leslie T. Campbell, Assistant Attorneys General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the appellant's conviction but vacate the death sentence, and remand for a new penalty phase proceeding.

Facts and Procedural History
On October 1, 2004, the grand jury indicted appellant, Daniel Ely Perez, and Calvin Cedric Green for the first-degree murder of Perez's wife's aunt, Susan Martin,[1] for burglary of Martin's home during which an assault or battery upon Martin was committed while the assailant was armed with a dangerous weapon, and for robbery with a deadly weapon. The charges against Perez and Green resulted from the stabbing of Martin and removal of certain property from her residence. On August 29, 2001, Martin's body was found lying in a large amount of blood in the front entrance of her home in Port St. Lucie. The cases of Green and Perez were severed prior to trial pursuant to a Stipulated Motion for Severance. Perez's trial began on April 28, 2003, and on May 8, 2003, he was found guilty of all three counts of the indictment as charged.
At trial, Officer James Weinart of the Port St. Lucie Police Department testified that on August 29, 2001, at approximately 1:45 p.m., he responded to a 911 call requesting that a welfare check be conducted at Martin's residence. Upon arriving at Martin's residence, Officer Weinart knocked on the front door and rang the doorbell but received no response. After several unsuccessful attempts to make contact with the occupant, the officer opened the front door, which was unlocked, and found Martin lying "on her back with several stab wounds, head trauma and blood all over the floor." The officer immediately closed the door and notified police headquarters. Subsequently, *354 Detective Anthony Sakala, a police detective who had previously investigated a theft that was reported by Martin in July of 2001, was called to the crime scene to identify the victim.
The lead detective on the case, Michael Beath, requested the phone records for both of the land lines registered to Martin as well as her cell phone. Detective Beath discovered that Martin had called Bell South from her cell phone at 1:07 a.m. on the morning of the crime. Bell South operator Vanlesha Gaskins testified that Martin had called to report that her house phone was not working. Gaskins testified that in response to the call she conducted several tests that led her to conclude that a phone line may have been cut. Gaskins stated that Martin was talking in a low whisper and ended the call in a low tone sounding somewhat scared and simply stating that she "had to go." David Gose, a service technician for Bell South, was dispatched to Martin's residence on August 29, 2001, and ascertained that both the phone line going from the street to Martin's house and the line connecting the phone box on the outside of the house to the inside of the house had been cut.
At trial, several witnesses for the State testified with regard to evidence discovered at the crime scene. Ron Schoener, a crime scene investigator for the Port St. Lucie Police Department, testified that a side entrance door leading into the garage of Martin's house was ajar and that the screen to a window in the door was cut in two pieces and removed. The investigator further testified that the glass of the window had also been removed and was leaning against some boxes just inside this side entrance door. The molding from a window adjacent to the garage had also been removed and was found lying in the grass, and the light bulbs of two spotlights on the exterior of the house had been disabled.
The interior of the house appeared to have been ransacked because drawers were opened with the contents dumped out and strewn about. Martin's body was found directly inside the front door of the house, with her head approximately seven feet from the door, and her body was lying on the back with the hands above her head in a large amount of blood. A white sock was on the floor near the head of the body. A shoeprint was discovered in the blood near Martin's body, and there were several additional shoeprints that led from the body toward the bathroom area. A cane with a large brass duck head was found in the bathroom and a gray or silver sock was recovered from the area between the master bedroom and the bathroom. No fingerprints of any value were found inside the house, which was consistent with the conclusion that any assailant was wearing something over his or her hands and corresponded with the socks found at the scene.
The medical examiner, Dr. Roger Mittleman, described Martin's injuries in detail. Her autopsy revealed that she had suffered a blunt force injury to the left side of the head resulting in bruising and a laceration of the scalp but which did not result in a skull fracture or any damage to her brain. The bruising underlying the laceration indicated that Martin was alive when she was struck, and Mittleman opined that Martin most likely survived the blow. In total, Martin suffered ninety-four stab wounds, which averaged one-half inch in length with a penetration depth from one-half inch to one-and-one-half inches indicating that one weapon made all of the wounds. The wounds included eight stab wounds to the left side of her neck, four striking the jugular vein; twenty-four stab wounds to the right lateral torso, several of which punctured the liver and right lung resulting in hemorrhaging into *355 the right lung cavity, which indicated she was alive at the time these wounds were inflicted; twenty stab wounds on the left side of her body; twenty-four stab wounds to her middle and lower back; and eighteen stab wounds to her abdominal area. Red marks on Martin's neck indicated that something had been pulled against her neck, such as a thin necklace. There were also defensive wounds to Martin's hand area indicating that she had been attempting to ward off an attack.
The medical examiner testified that although he could not definitively conclude the exact sequence of the wounds, it was his opinion that the wounds to the abdominal area and back occurred after the wounds to the neck and the right side of the body. Four of the wounds to Martin's neck were determined to have been of a character to be lethal, as were several to the right side torso, where the weapon entered her liver. Mittleman testified that Martin would have lost consciousness within seconds to a minute or two as a result of the wounds inflicted to her neck, but that she could have survived ten to fifteen minutes from the wounds inflicted to her right torso area. He was unable to determine whether the stabber was right or left-handed.
Detective Beath's investigation included three separate interviews with Perez. Beath initially interviewed Perez on August 29, 2001, the same day he was called to the scene to investigate the crime. Beath testified that he met with Perez at the police department, where Perez arrived voluntarily upon request. Subsequently, on August 31, 2001, Beath again interviewed Perez on a voluntary basis. At this point, Beath knew through Detective Sakala that Perez had been implicated by Martin in the previous jewelry theft from her residence and that Perez was aware of this fact. During these initial interviews, Perez denied any involvement in the earlier theft. Additionally, when Perez was asked whether he was in the habit of carrying a knife he responded that he carried one while at work. Beath noted that Perez was wearing new shoes during these interviews. Subsequently, it was discovered that Perez had pawned the ring and earrings Martin had previously reported stolen during the prior theft. The police also discovered that Perez had sold some of Martin's missing coins.
Beath again interviewed Perez at the police department when he arrived looking for his wife, who was being interviewed at the time. During this interview, Beath confronted Perez with the evidence of his possession of the previously stolen jewelry. Perez's initial story, denying any involvement, changed several times during the interview from stating that a drug addict gave him the jewelry, to stating that he had taken a pill bottle from Martin's house and gave it to the owner of a pawn shop to sell its contents, to ultimately admitting that he had removed a pill bottle from the home and discovered jewelry inside that he later pawned. After Perez was advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he told the police he wanted to continue the interview. Perez was subsequently advised that he was under arrest for the prior jewelry theft.
After further questioning with regard to Martin's stabbing, Perez revealed a plan that he had with Gary Reed and Calvin Green to steal Martin's car. Initially, Perez admitted that he provided Reed and Green with directions to Martin's house to steal the car on the night of the murder but denied that he was ever present at the scene. Perez admitted that he came into possession of the coins taken from the house in return for giving Reed and Green directions to Martin's house. Thereafter, *356 Perez changed his story, admitting that he actually drove to Martin's house in his sister's car and that Reed and Green followed him in another vehicle. Perez told the police that after sitting in his car and waiting for ten to fifteen minutes, he drove by the house and saw the front door wide open. Perez stated that Reed and Green ran out of the front door, that Green was covered in blood, and that all three went their separate ways. Changing his story again, Perez next told the police that he actually opened the front door and saw Green on top of Martin with a six-inch switchblade punching her in the head and then Perez ran away.
When the police confronted Perez with evidence of the shoe prints that were discovered inside the house, Perez again revised his story, telling the police that he actually entered the house to attempt to remove Green off of Martin and then left. Later, Perez changed his story again, telling the police that he actually ran through the house looking for Reed and when he did not see him he fled the scene with Green in his car. Perez stated that when he came upon Green and Martin she was not screaming but that he heard her gargling on blood in her throat. Perez's final version of the events was that only one car was driven to the scene and that Reed was never actually present at the house. In this final version, Perez admitted that he witnessed Green stabbing Martin and heard her gargling on blood. Perez then ran through the house two steps behind Green while Green was grabbing things and placing them into a bag. Perez also stated that while inside the house, the contents of Martin's purse were dumped out. The key to her car was located and both he and Green went outside to the car and unlocked the door but fled the scene before actually taking the car. Perez told the police that both he and Green had socks on their hands when entering the house. The police videotaped the interviews conducted on the fifth and the sixth of September during which all of these details were revealed and the tape was played to the jury. No other eyewitness testimony was produced at trial.
During the morning of September 6, 2001, Perez accompanied the police on a drive-around to show them where he and Green disposed of various pieces of evidence from the crime. During this period, the police recovered several items of evidence: a bag that was removed from Martin's house on the night of the crime; the key to Martin's car; Martin's watch; a "doo-rag"; and a pen allegedly belonging to Martin. Perez showed the police the canal where he alleged the murder weapon was thrown, although the weapon was never recovered. Perez directed the police to an area where he alleged that Green had dumped his bloody clothes, but no clothes were ever recovered. Perez also took the police to a dumpster where he allegedly discarded his bloody shoes, but they were never recovered.
Subsequent to the interview of Perez on September 5 and 6, Beath attempted to find a pair of shoes that matched the shoe prints found at the crime scene. Beath found a pair of shoes that appeared to have a similar pattern. Beath testified that Perez's father-in-law, Joe Burns, went to the store where Beath had found the shoes, and Burns picked out the same pair as resembling sneakers that he had seen Perez wearing around the time of the crime. Later, a forensic firearm and tool mark examiner compared the shoes from the store to the shoeprint found at the crime scene and determined that the patterns of the two matched.
Perez presented no evidence at trial. The jury found Perez guilty of felony murder. The jury's verdict was entered on a *357 special verdict form that provided space for the jury to indicate whether they had found Perez guilty of first-degree murder as charged. The verdict form also contained a space for the jury to designate whether they found Perez guilty under the theory of premeditated murder, felony murder, or both. As noted, the jury indicated on the verdict form that they found Perez guilty of felony murder but declined to find him guilty of premeditated murder.
During the penalty phase, the State presented four witnesses. State witness Wes Starling, a Lieutenant with the Martin County Sheriff's Office, testified with regard to his investigation of Perez in 1995 for a stabbing incident, which resulted in Perez being convicted of attempted second-degree murder. The State also presented Margie Ann Barnes and Grace Burns, relatives of Martin, who read prepared statements regarding their interactions with Martin. During rebuttal, the State presented Dr. Gregory Landrum to testify with regard to Perez's mental condition in general and at the time of the crime. Landrum had previously evaluated Perez in relation to his previous second-degree murder charge and had also reviewed various documents relating to the present case, including Perez's videotaped interview. Landrum essentially agreed with Perez's mental health expert's diagnosis, but added that Perez displayed features of antisocial personality disorder.
Perez presented five family members and one mental health expert during the penalty phase. Perez's sister, wife, mother, father, and grandmother all testified with regard to Perez's upbringing and past mental health conditions that were present throughout his childhood and teenage years and his history of hospitalization, medication, and treatment. It was revealed that when Perez was nine his mother had left him with a male neighbor, whom she later discovered had sexually molested him. Perez's father and mother were divorced when Perez was four or five and the father had little contact with him during his younger years.
Dr. Michael Riordan testified on Perez's behalf regarding his mental condition in general and at the time of the offense. In evaluating Perez, Riordan reviewed Perez's medical history and school records, interviewed his wife, mother, and sister, and administered a number of tests to Perez. Riordan did not review Perez's videotaped interview. Riordan noted that Perez became suicidal as a result of the sexual abuse he suffered and had made four suicide attempts. Riordan's diagnosis was that Perez was suffering from bipolar disorder, attention deficit hyperactivity disorder, and borderline personality disorder. On cross-examination, Riordan noted that Perez had also been diagnosed with oppositional defiant disorder in 1993 accompanied by a history of acting aggressively towards peers and authority figures, having hostile impulses, losing his temper, acting defiantly, and using a weapon against others. Perez declined to testify at his penalty phase.
On May 13, 2003, the jury returned a recommendation of death by a vote of nine to three. During the Spencer[2] hearing, the State presented Martin's sister, who read a statement expressing the pain caused by her sister's death but also expressing her family's distaste for the death penalty. Perez presented additional testimony of his sister, mother, and wife on the issue of mitigation along with letters written to the trial court from Perez's niece and nephew. On July 21, 2003, the trial judge sentenced Perez to death for the felony murder of Martin and to life imprisonment *358 for both the burglary with an assault or battery while armed conviction and robbery with a deadly weapon conviction. In pronouncing Perez's sentence, the trial court determined that the State had proven beyond a reasonable doubt the existence of four statutory aggravators: (1) Perez had previously been convicted of another capital felony or a felony involving a threat of violence to the person; (2) Perez committed the murder in this case while he was engaged, or was an accomplice, in the commission of, or an attempt to commit or in flight after committing or attempting to commit a robbery or a burglary of a dwelling; (3) the murder was committed for pecuniary gain; and (4) the murder was committed in an especially heinous, atrocious, or cruel fashion (HAC). The trial court determined that two of the aggravators, pecuniary gain and in the commission of robbery or burglary, merged, resulting in a total of three aggravating circumstances. The trial court further determined that one statutory mitigating circumstance existed, that Perez was under extreme mental or emotional disturbance at the time of the crime, which the court accorded little weight. The trial court found a total of fourteen nonstatutory mitigating circumstances, three of which the trial court assigned moderate weight, two of which the trial court assigned some weight, and nine to which the trial court assigned little weight.[3] This direct appeal followed.

ANALYSIS

GUILT PHASE

I. Juror Disqualification
Perez asserts that he is entitled to a new trial as a result of the trial court denying his motion to disqualify a juror because the juror failed to disclose her relationship with a State witness during voir dire when the State read its witness list to the jury pool. During Perez's trial, juror Nicosia wrote a note to the trial court explaining that she had knowledge of a witness for the State, Beasely, through having submitted a bid to do paint work for Beasely and an introduction through friends. Perez's trial counsel immediately requested that Nicosia be discharged, and the trial court initially denied that request, finding that Nicosia's ability to render a fair and impartial verdict was not impaired by her contact with Beasely. Just prior to closing arguments the trial court addressed the matter again, at which time the State suggested that "if the defense is still asking that she be disqualified, . . . we would rather go that route and disqualify her ... so there is no issue on that." When faced with this opportunity to obtain the relief initially sought by the defense, Perez's trial counsel affirmatively rejected *359 the opportunity and stated "that if there is no cause challenge then nothing should change," thereby waiving any objection to Nicosia serving on this jury.[4] Based on the foregoing, we conclude that this issue was waived and is not properly preserved for review by this Court and we therefore decline to address this issue on appeal.

II. Motion to Suppress
Perez asserts the trial court erred when it denied his motion to suppress his statements given to the police on September 5 and 6, thereby entitling him to a new trial in which the statements should be excluded from evidence. In Perez's motion to suppress, he asserted that his statements were obtained illegally because he was "coerced/forced or under duress at the times of the statements," and that he made the statements "without a knowing and voluntary waiver of his rights and without the benefit of counsel." During the hearing on Perez's motion, his counsel made two specific assertions to the trial court: (1) that the statement "was given through misleading or confusing statements of Perez's rights" by the police in that he was misled regarding his custody status; and (2) "that the statement was obtained through coercive measures, duress due to the time period involved."
"For an issue to be preserved for appeal, . . . it `must be presented to the lower court and the specific legal argument or ground to be argued on appeal must be part of that presentation if it is to be considered preserved.'" Archer v. State, 613 So.2d 446, 448 (Fla.1993) (quoting Tillman v. State, 471 So.2d 32, 35 (Fla.1985)); see also Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982). We have determined that several points that Perez now presents on appeal before this Court were not properly preserved and, therefore, we decline to address the merits of those claims. Specifically, Perez's assertion that Detective Beath's recitation of the Miranda warnings was incomplete because he was not advised of his right to have an attorney present during questioning was never presented to the trial court in Perez's motion or in the corresponding hearing, and therefore was not properly preserved for appellate review. See Archer, 613 So.2d at 448; Steinhorst, 412 So.2d at 338. Additionally, Perez's claims  that he was denied a phone call,[5] that he was physically uncomfortable during the interrogation, that the overall tenor of the questioning was inappropriate, and that he was told the police would protect his family if he gave a statement  were also not presented to the trial court below and therefore are not properly before this Court for consideration.
With regard to Perez's assertions that have been properly preserved for appellate review, we conclude that the trial court's disposition of these claims is supported by the record and that the trial court appropriately denied the motion to suppress. We reach our conclusion guided by the principle of law in Florida that
[a] trial court's ruling on a motion to suppress is clothed with a presumption of correctness with regard to the trial court's determination of historical facts. Appellate courts, however, independently review mixed questions of law and *360 fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendments.
Davis v. State, 859 So.2d 465, 471 (Fla. 2003).
The first properly preserved basis that Perez alleges as grounds for suppression is that Detective Beath improperly implied that he was free to leave when Beath knew that there was an outstanding felony arrest warrant for Perez at the time of the interview and, therefore, under Florida law, Beath had a duty to arrest him. Perez further contends that by implying that he was free to leave, Beath intended to and in fact did mislead him as to his true position during the interview, which tainted any waiver of rights he provided.
In support of this contention, Perez directs our attention to our opinion in Ramirez v. State, 739 So.2d 568 (Fla.1999). In Ramirez, a juvenile offender was implicated in a murder by an associate, Grimshaw. See id. at 572. Grimshaw placed a sheriff-monitored phone call to Ramirez during which items of physical evidence related to the crime were discussed. See id. Subsequently, Ramirez, who was seventeen at the time, was visited at home by a sheriff's deputy and turned over evidence relating to the crime. See id. Ramirez also took the deputy to retrieve other items and agreed to accompany the deputy to the station for questioning. See id. At the station, Ramirez was interrogated and eventually admitted to breaking into the victim's house. See id. Subsequent to his admission and prior to any Miranda warning, a detective stated:
Why don't you let Nate [Ramirez] know about his rights. I mean, he's already told us about going in the house and whatever. I don't think that's going to change Nate's desire to cooperate with us.
Id. At this point, Ramirez asked if he was being placed under arrest and the detective responded, "No, no, I'm just reading your rights at this time." Id. Later, Ramirez admitted his involvement in the murder and after he had fully confessed, the detectives obtained a written waiver of his Miranda rights. Id.
In Ramirez, we concluded that the defendant's statement should have been suppressed. See id. at 578. In so holding, we stressed that Ramirez was never told he was free to leave, that he was a juvenile (just turning seventeen), and that the detectives exploited his prior unwarned statements in an effort to downplay the significance of the Miranda warnings when they suggested that the warnings would not change Ramirez's desire to cooperate. See id. at 574, 576. Additionally, we noted that when the detectives responded negatively to Ramirez's question pertaining to whether he was under arrest,
Ramirez had already implicated himself in the crime and the detectives had independent corroboration of his involvement and ample probable cause to arrest him for murder[,] ... [and that] [i]t [was] simply inappropriate for the police to make a representation intended to lull a young defendant into a false sense of security and calculated to delude him as to his true position at the very moment that the Miranda warnings [were] about to be administered.
Id. at 576-77 (emphasis supplied).
Perez's reliance on Ramirez is misplaced. The defendant in Ramirez was a juvenile, a fact that we stressed throughout our opinion, see id. at 571, 574-78, unlike Perez who was twenty-three at the time of the interview at issue here. Another distinguishing factor is that the defendant in Ramirez was not told he was free to leave, see id. at 574, but in the *361 instant case Perez arrived at the police station of his own accord and was explicitly made aware that he was there on a voluntary basis and was free to leave at any time.
This case more closely resembles the facts of Davis v. State, 698 So.2d 1182 (Fla.1997), than Ramirez. In Davis, the defendant, as did Perez, voluntarily agreed to go to the police station for questioning on three occasions regarding the death of a former girlfriend's daughter. See id. at 1186. At the time of the third interview the police had a warrant for Davis's arrest, but he was not informed of this status prior to questioning. See id. In holding that the statements made by Davis during this third interview were admissible, we noted:
[T]he sole fact that police had a warrant for Davis's arrest at the time he went to the station does not conclusively establish that he was in custody. Rather, there must exist a "restraint on freedom of movement of the degree associated with a formal arrest." Roman v. State, 475 So.2d 1228, 1231 (Fla.1985). The proper inquiry is not the unarticulated plan of the police, but rather how a reasonable person in the suspect's position would have perceived the situation. Id.

Davis, 698 So.2d at 1188.
The Third District utilized an approach similar to Davis in State v. Manning, 506 So.2d 1094 (Fla. 3d DCA 1987). There, the defendant had voluntarily submitted to two police interviews after being informed that he was a suspect. See id. at 1095. Subsequently, the police obtained a warrant for his arrest and requested that Manning grant them a third interview without informing him of the existence of the warrant. See id. In concluding that the statements made by Manning at this third interview were admissible, the district court noted:
The fact that Manning was not immediately informed that he was under arrest is insufficient to find that his waiver was not voluntary.... There is no question that Manning was read his rights many times.... Just as an undercover investigation may continue, notwithstanding the fact that a search warrant has been issued, United States v. Alvarez, 812 F.2d 668 (11th Cir.1987), if all other criteria have been satisfied, an interrogation may take place notwithstanding the fact that an arrest warrant has been issued.
Id. at 1096-97. See also State v. Wallace, 673 So.2d 914 (Fla. 2d DCA 1996). The facts of this case, similar to the cases cited above, support the trial court's determination that any waiver was voluntary and that Perez's statement to the police was not procured through deception sufficient to preclude its admission at trial. Therefore, we hold that the trial court properly denied this claim.
Perez also asserted below that the length of the interview, approximately twenty-five hours, per se required suppression of his statement by the trial court. In denying this claim, the trial court found that "[Perez] was given opportunities to nap during the interview process," that "Perez never expressed being tired to the point that he wanted to discontinue the interview process," and that "[a]t no time did Perez express a desire to stop the interview process." We conclude that the record supports these findings. The transcript of Perez's interview, in addition to Beath's testimony at the hearing on Perez's motion to suppress, which was not refuted by any testimony offered by the defense, reveals that Perez was given the opportunity to take smoking and restroom breaks during the interview; Perez was *362 given snacks and drinks when requested; Perez left the investigating officer's custody for approximately two hours to take a voluntary polygraph test; Perez was provided breakfast and lunch on September 6; and Perez was provided the opportunity to sleep for approximately six to eight hours.
In Chavez v. State, 832 So.2d 730 (Fla. 2002), this Court determined that a lengthy interrogation period with intermittent breaks alone was "not so coercive as to render Chavez's confession involuntary." Id. at 749. In so holding, we noted:
Although Chavez was questioned over the course of several days, he was provided with food, drink, and cigarettes (as requested) at appropriate times, and permitted to have frequent breaks. His interrogation was also interspersed with time away from the police facilities for visits to various properties, a six-hour rest period (where Chavez was offered a blanket and a pillow), and times when he was left alone for quiet reflection. He was repeatedly given Miranda warnings, in Spanish, and indicated each time that he fully understood them.
Id. The circumstances surrounding the interrogation by the police in Chavez are strikingly similar to the facts of the present case. Moreover, the interrogation at issue here was of less duration than that in Chavez. Perez attempts to distinguish Chavez by noting that Chavez was repeatedly read his rights and indicated he fully understood them whereas here, Perez was given only a partial recitation of his rights. However, this issue was not presented to the trial court below and was therefore waived, rendering this attempt at distinguishing Chavez moot.
Given the similarities between the totality of the circumstances surrounding the interrogations in this case and Chavez, along with the time element involved here, we conclude that the length of the officers' interview of Perez was not so great as to per se render his statements or waiver or both involuntary. See also Conde v. State, 860 So.2d 930, 951-52 (Fla.2003) (holding confession by defendant was not rendered involuntary by separate interrogation periods lasting approximately twelve and thirteen hours each and ending past 2:30 a.m. on each occasion when defendant "was provided food, drink, access to restrooms, the opportunity to place phone calls, and at least eleven hours away from the detectives at a place where he could rest"); Walker v. State, 707 So.2d 300, 311 (Fla. 1997) (upholding voluntariness of confession where defendant was questioned for six hours, provided drinks, and allowed use of restroom, and detectives never threatened capital punishment or promised more than to tell prosecutor defendant cooperated).
Based on the foregoing analysis of the issues properly preserved for appellate review in the trial court below, we hold that the trial court properly denied the motion to suppress and correctly admitted Perez's statements into evidence.

III. Prejudicial Comments at Trial
In its opening statement to the jury, the State made the following comment:
One month later  we go to August 27, 2001. That was a Monday. That Monday night the defendant just after midnight which would be the morning of the 28th, drove up from Martin county where he lived and he went to Ms. Martin's house. He went there armed with a very small knife that he always carried and he went there, ladies and gentlemen, for two reasons.
Perez's trial counsel objected to the comment that Perez always carried a knife as irrelevant and moved for a mistrial. In *363 response, the State argued to the judge that Perez had acknowledged that he carried a knife. The trial court overruled the objection and denied the motion, reasoning that the statement was not overly prejudicial and that the information was relevant to the issue of whether the crime was committed with a switchblade, consistent with Perez's statement, or another type of knife. Perez claims that the trial court erred in denying his motion for a mistrial because he asserts that whether he personally carried a knife was a major issue as to both guilt and penalty. Thus, the prosecutor's comment with regard to a knife was unduly prejudicial to him. Moreover, Perez contends that the curative instruction given was not likely to clear any confusion caused by that which had transpired.
"[A] trial court's ruling on a motion for mistrial is subject to an abuse of discretion standard of review." Goodwin v. State, 751 So.2d 537, 546 (Fla.1999). Moreover, "[w]ide latitude is permitted in arguing to a jury.... The control of comments is within the trial court's discretion, and an appellate court will not interfere unless an abuse of discretion is shown." Breedlove v. State, 413 So.2d 1, 8 (Fla. 1982) (citations omitted). Under the abuse of discretion standard, a trial court's ruling will be upheld unless the "judicial action is arbitrary, fanciful, or unreasonable, .... discretion is abused only where no reasonable [person] would take the view adopted by the trial court." Trease v. State, 768 So.2d 1050, 1053 n. 2 (Fla.2000) (alteration in original) (quoting Huff v. State, 569 So.2d 1247, 1249 (Fla.1990)).
The comments challenged by Perez were made during opening statements, the purpose of which was for counsel to outline what he in good faith expected to be established by the evidence presented at trial. See Conahan v. State, 844 So.2d 629, 640 (Fla.2003); Occhicone v. State, 570 So.2d 902, 904 (Fla.1990). Perez has failed to demonstrate that the statements at issue here were misleading or made in bad faith. Rather, we conclude that the attorney for the State made the comments in good faith with the expectation that they would be established by evidence he anticipated presenting during trial. Although the transcript of Perez's interview with the police reveals that Perez did not indicate that he always carried a knife, it was clear that he did admit that he carried a knife. Additionally, although the trial court ruled it inadmissible, the State proffered testimony from Perez's brother-in-law that he knew Perez to carry knives. Based on the foregoing, Perez's reliance on Jackson v. State, 818 So.2d 539 (Fla. 2d DCA 2002) (holding that it was error to deny motion for mistrial where prosecutor extensively recited damaging testimony in opening that was never presented at trial), Gore v. State, 719 So.2d 1197 (Fla.1998) (holding that latitude permitted in opening does not extend to permit comment on evidence ruled inadmissible prior to trial), and Mills v. State, 875 So.2d 823 (Fla. 2d DCA 2004) (holding that it was error to deny mistrial where prosecutor improperly suggested the existence of corroborating evidence that was never presented at trial), is misplaced. Additionally, Perez's objection to the comments as irrelevant was properly rejected by the trial court. The indictment charging Perez indicated that he, "in the course of committing the robbery[,] carried a firearm or other deadly weapon, to wit: a knife." Therefore, whether Perez owned a knife or carried a knife was relevant at trial, and therefore the relevancy objection was properly denied. Given the evidence that the State anticipated presenting at trial and the overall nature of the single isolated comment made by the prosecutor, we conclude that the trial court properly denied Perez's motion for a mistrial.
*364 Perez also challenges a statement made by Detective Beath during his testimony at trial, specifically, Beath's testimony that Perez had indicated to Beath that "[Perez] did carry a knife on a regular basis." Perez's trial counsel objected and moved for a mistrial, claiming that a habit had not been established and therefore the testimony was irrelevant. At this point, the State conceded that Beath's testimony did not reflect precisely what Perez had said with regard to carrying a small blade knife. The trial court overruled the objection and denied the motion for a mistrial but gave the following curative instruction to the jury at the defense's request:
Members of the jury, the exhibit 52 admitted into evidence is the videotape of portions of the interview with Mr. Perez. It is the best evidence of what Mr. Perez said so you need to rely on your determinations about what is said off that videotape.

(Emphasis supplied.)
The transcript of Perez's interview with the police, which the jury had while viewing the videotape of the interview, reveals the following exchange between Beath and Perez regarding Perez's knife:
BEATH: Do you normally carry a pocketknife or anything like that?
PEREZ: When I'm at work.
BEATH: Okay. Any other times you normally carry knives or anything like that? Do you have collections of knives, or anything?
PEREZ: I have one. Um, as far as carrying it all over the place all the time? No. There's occasions where I, I have it in my pocket, like after I get off of work or something, I'll have it in my pocket. But it's, it's a little, the one I have now? It's a, it's a little lock blade, it's like a, not even a, a 3" blade.
BEATH: You have it on you?
PEREZ: No.
. . . .
BEATH: You use it for work?
PEREZ: Yeah, it's for cuttin' open wardrobe boxes.
BEATH: So, it's pretty sharp to, I mean you could take it and (cutting motion through paper)?
PEREZ: Yeah, when I sharpen it.
. . . .
BEATH Okay. So, do you keep it, I mean, is it a knife that you keep it, well maintained?
PEREZ: Yeah.
BEATH: Okay. All right. Um, you take it to work with you?
PEREZ: Yeah.
BEATH: You still do?
PEREZ: Yeah.
In light of the curative instruction given by the trial court, we hold that the trial court did not abuse its discretion when it denied Perez's motion for mistrial based on Beath's testimony. A motion for mistrial is properly denied where the matter on which the motion is based is rendered harmless by a curative instruction. See Buenoano v. State, 527 So.2d 194, 198 (Fla.1988); Ferguson v. State, 417 So.2d 639 (Fla.1982); Johnsen v. State, 332 So.2d 69 (Fla.1976); Rivera v. State, 745 So.2d 343, 345 (Fla. 2d DCA 1999); see also 55A Fla. Jur.2d Trial § 284 (2000). The comment made by Beath was a short one-sentence statement during a lengthy direct examination. Moreover, when the statement was made, Perez's trial counsel objected and the trial court immediately gave a curative instruction at the defense's request in which the jury was instructed that the videotape of Perez's interview was "the best evidence" of what Mr. Perez had stated and the jury should "rely on your determinations about what is said off that videotape." Given the above, Perez's motion for a mistrial was properly denied.
*365 Notwithstanding our conclusion above, we also note that the error, if any, resulting from the prosecutor's opening statement and the detective's testimony was harmless because we "can say beyond a reasonable doubt that the error did not affect the verdict." Mansfield v. State, 758 So.2d 636, 644 (Fla.2000). In relation to the prosecutor's comments during opening statement, we note that the trial judge specifically instructed the jury on five separate occasions that the comments of the attorneys did not constitute evidence. Just subsequent to empanelling the jury, the trial court properly instructed and cautioned the jury as follows:
[T]he attorneys will have an opportunity to make an opening statement. The opening statement gives the attorneys a chance to tell you what evidence they believe will be presented during the trial. What the lawyers say is not evidence and you're not to consider it as such.

(Emphasis supplied.) Again, prior to both the opening statement and closing argument, during closing arguments themselves, and again during the trial court's final instructions, the jury was reminded that the attorneys' words and arguments did not constitute evidence. Additionally, as we previously stated, any harm resulting from the detective's comment was rendered harmless by the trial court's instruction to the jury that the videotape was "the best evidence" of what Mr. Perez said for purposes of jury consideration. Based on the foregoing, we conclude that any error, if any, that resulted from these comments was harmless and therefore Perez's motion for mistrial was properly denied.

PENALTY PHASE

I. Enmund/Tison

In Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the United States Supreme Court overturned Enmund's death sentence for felony murder because this Court "affirmed the death penalty in th[e] case in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken." Id. at 801, 102 S.Ct. 3368. The High Court revisited its holding in Enmund in Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). In Tison, the High Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." Tison, 481 U.S. at 158, 107 S.Ct. 1676. Although the United States Supreme Court held in Cabana v. Bullock, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), overruled in part on other grounds by, Pope v. Illinois, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), that "the Constitution does not require a specific jury finding on the Enmund issue [and that it] requires only that the `requisite findings are made in an adequate proceeding before some appropriate tribunal  be it an appellate court, a trial judge, or a jury,'" we have determined that the issue should be submitted to the jury. Jackson v. State, 502 So.2d 409 (Fla. 1986) (quoting Cabana, 474 U.S. at 392, 106 S.Ct. 689). In Jackson v. State, 502 So.2d 409 (Fla.1986), we announced procedures for trial courts to use to comply with Enmund. The procedures we outlined in Jackson were modified in Diaz v. State, 513 So.2d 1045 (Fla.1987), to reflect the United States Supreme Court's decision in Tison wherein the High Court expanded upon the criteria which would satisfy the Enmund culpability requirement. Diaz, 513 So.2d at 1048 n. 2. After Jackson and Diaz, trial courts in Florida have been directed to instruct the jury "before its *366 penalty phase deliberations that in order to recommend a sentence of death, the jury must," Jackson, 502 So.2d at 413, "make findings satisfying Enmund and. . . Tison." Diaz, 513 So.2d at 1048 n. 2. "Further [the Court] reiterate[ed] that the trial courts shall include in their sentencing orders findings supporting the Enmund/Tison culpability requirement." Id.
The trial court below properly followed the procedures outlined by our opinion in Jackson as modified by Diaz when it instructed the jury at the penalty phase that "in order for you to recommend a sentence of death in this case you must find [Perez] was a major participant in the crime of robbery or burglary and that [Perez's] state of mind at the time amounted to wreckless [sic] indifference to human life." Subsequent to being given this instruction, the jury rendered a verdict recommending the death penalty by a vote of nine to three.
Perez contends that the guilty verdict in this case did not encompass the necessary facts to justify a sentence of death because the jury did not make a specific finding that he actually committed the stabbings or that he was a major participant in the felony and acted with a reckless indifference for human life. These claims lack merit. The jury's verdict finding Perez guilty of felony murder was not required to include a separate and distinct Enmund/Tison determination. The Enmund/Tison finding is to be made during the penalty phase of a murder trial to determine if the sentence of death may be constitutionally imposed. See Jackson, 502 So.2d at 413. During the penalty phase here, the trial court properly instructed the jury with regard to the Enmund/Tison issue. Whether Perez was eligible to be sentenced to death at all was appropriately determined at the guilt phase when the jury unanimously found him guilty of first-degree felony murder, which is classified in Florida as a capital felony with the maximum penalty authorized by statute being death. See Shere v. Moore, 830 So.2d 56 (Fla.2002).
Moreover, there is competent, substantial evidence in the record to support the determination that the jury found Perez to have been a major participant in the felonies committed and that he acted with a reckless indifference to human life. The jury found Perez guilty of the following crimes: first-degree felony murder; burglary of a dwelling in the course of which he made an assault or battery upon a person and was armed or armed himself with a dangerous weapon; and robbery in the course of which he was carrying a deadly weapon, a knife. Additionally, the jury was instructed that if they found that the crimes at issue were the independent acts of another, then Perez should not be found guilty of those crimes. Based on the verdicts, the jury obviously determined that Perez was a major participant in the burglary, during the commission of which he committed an assault or battery while armed, and the robbery, during the course of which he carried a deadly weapon, and that these crimes were not the independent acts of another. By virtue of these verdicts, it is clear that the jury found Perez to have acted with a reckless disregard for human life. See Jackson, 502 So.2d at 412 ("[B]y being a major participant in the armed robbery, appellant, at the very least, contemplated that life would be taken.").
Perez's contention that the jury could have found him guilty vicariously through the acts of Green does not vitiate the conclusion that he was a major participant in these crimes. The instruction given by the trial court regarding principal responsibility was as follows:

*367 If the Defendant helped another person or persons commit or attempt to commit a crime, the Defendant as [sic] a principal and must be treated as if he had done all the things the other person or persons did if the Defendant had a conscious intent that the criminal act be done and the Defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the crime.

(Emphasis supplied.) Satisfaction of these criteria alone would indicate major participation in the commission of a crime. Therefore, the mere fact that the jury may have found Perez guilty as a principal does not, as Perez asserts, prevent a finding that he was a major participant in the crimes.
Perez next asserts that his penalty phase proceeding was unconstitutional because the jury's determination of the Enmund/Tison issue was not unanimous. We have previously addressed such a claim and denied relief. In James v. State, 453 So.2d 786 (Fla.1984), we denied relief on a claim identical to that which Perez now asserts by noting that "the United States Supreme Court has never held that jury unanimity is a requisite of due process, and in Alvord v. State, 322 So.2d 533 (Fla.1975), cert. denied, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976), this Court held that the jury in a capital case could recommend an advisory sentence by a simple majority vote. We do not find that unanimity is necessary when the jury considers this issue." James, 453 So.2d at 792 (footnote omitted) (emphasis supplied). See also Parker v. State, 904 So.2d 370, 383 (Fla.2005) ("This Court has repeatedly held that it is not unconstitutional for a jury to recommend death on a simple majority vote. Moreover, this Court has rejected claims that Ring v. Arizona, requires aggravating circumstances to be individually found by a unanimous jury verdict.") (citations omitted); Israel v. State, 837 So.2d 381, 392 (Fla.2002) (rejecting appellant's assertion, post-Ring, that his death sentence was unconstitutional based on the jury recommending death by a split vote).
Perez also alleges infirmity in the penalty phase because the jury was not instructed that it was required to make the Enmund/Tison finding beyond a reasonable doubt. This claim was not preserved at the trial level because Perez did not object to the jury instruction when the language was proposed or object anytime thereafter prior to the jury retiring to deliberate. See Fla. R.Crim. P. 3.390(d) ("No party may raise on appeal the giving or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection."). In fact, defense counsel expressly agreed to the language of the instruction that the trial court read on this issue:
THE COURT: ... Give me the language you're proposing.
[THE STATE]: In order to recommend a sentence of death in this case you must find that the Defendant was a major participant in the crime of burglary or robbery and the Defendant's state of mind amounted to a reckless indifference to human life.
[THE DEFENSE]: We don't have an objection to that language.

. . . .
THE COURT: Defense agrees with that language?
[THE DEFENSE]: No objection to that language.

*368 (Emphasis supplied.) This argument was not preserved for review and is therefore not properly before the Court.
Procedural bar notwithstanding, this claim lacks merit. There is no authority in Florida that requires that the jury again be separately and independently instructed that the Enmund/Tison elements must be established beyond all reasonable doubt. The jury here was properly instructed and, by voting to recommend the death penalty, concluded that the Enmund/Tison culpability requirement was satisfied. Additionally, the trial court provided a detailed analysis of the evidence presented at trial in support of its finding that the requirement had been established beyond a reasonable doubt.[6]
Perez also claims that indications made by the State and the trial court to the jury that their penalty phase verdict was advisory and not binding renders his penalty phase unconstitutional. This Court has addressed claims of this nature and has repeatedly denied relief. See Card v. State, 803 So.2d 613 (Fla.2001) (holding that claim that instructions "that refer to the jury as advisory and that refer to the jury's verdict as a recommendation violate Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)" was without merit); Brown v. State, 721 So.2d 274, 283 (Fla.1998) (holding that the standard jury instructions fully advise the jury of the importance of its role, correctly state the law, do not denigrate the role of the jury, and do not violate Caldwell); Rose v. State, 617 So.2d 291, 297 (Fla.1993) (same); Robinson v. State, 574 So.2d 108 (Fla.1991) (same); Combs v. State, 525 So.2d 853 (Fla.1988) (same).
Perez's assertion that his penalty phase proceeding was constitutionally infirm because the trial court allowed the State to admit victim impact evidence was also properly denied by the trial judge. This claim has been denied by both the United States Supreme Court and this Court. See Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (determining that a state may properly decide that a jury should have before it victim impact evidence at sentencing); Windom v. State, 656 So.2d 432, 438 (Fla.1995) ("We do not believe that the procedure for addressing victim impact evidence, as set forth in the statute, impermissibly affects the weighing of the aggravators and mitigators ... or otherwise interferes with the constitutional rights of the defendant. Therefore, we reject the argument which classifies victim impact evidence as a nonstatutory aggravator in an attempt to exclude it during the sentencing phase of a capital case."); Allen v. State, 662 So.2d 323 (Fla.1995) (same). Additionally, Perez's contention that because the rules of evidence precluding the admissibility of hearsay do not apply to penalty phase proceedings pursuant to section 921.141(1) of the Florida Statutes, those proceeding are constitutionally inadequate also lacks merit. See Mendoza v. State, 700 So.2d 670, 675 (Fla.1997) ("We have recognized that hearsay evidence may be admissible in a penalty-phase proceeding if there is an opportunity to rebut."); Lawrence v. State, 691 So.2d 1068 (Fla. 1997) (same); Chandler v. State, 534 So.2d 701 (Fla.1988) (holding that admission in sentencing proceeding of hearsay testimony did not render subsection (1) of section 921.141 of the Florida Statutes unconstitutional). We do recognize that, pursuant to Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), out-of-court statements by witnesses that are testimonial in nature are *369 barred under the Confrontation Clause, unless witnesses are unavailable and the defendant had a prior opportunity to cross-examine them. See id. at 1374. However, Perez does not direct our attention to any specific statements in the record that he contends are testimonial in nature and, therefore, the holding in Crawford is inapplicable to Perez's current claim. Instead, Perez specifically asserts that section 921.141 of the Florida Statutes cannot pass constitutional muster because it allows for the admission of hearsay statements in penalty phase proceedings. As previously noted, we have rejected such a blanket attack on the constitutionality of this statutory provision in the past, and do so again in this case. Moreover, consistent with our prior decisions, we note that the United States Supreme Court has also expressed that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." Crawford, 541 U.S. at 68, 124 S.Ct. 1354.
Based on the foregoing analysis, we conclude that Perez has failed to establish that the death penalty was inappropriate here where the trial court properly instructed the jury that to impose the death penalty they were required to make the Enmund/Tison finding and the trial court performed a detailed analysis of the evidence supporting that finding in its sentencing order.
Perez next alleges that there was insufficient evidence presented at trial to establish that he either killed Martin or was a major participant in the felonies committed and acted with a reckless disregard for human life. Therefore, Perez asserts, the death penalty is disproportionate under the law established in Enmund and Tison. For Perez's death sentence to stand, the finding required by Enmund and Tison must be established beyond a reasonable doubt. See Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Perez cites to several cases as support for his contention that the facts in the present case do not sustain the trial court's finding that his conduct satisfied the Enmund/Tison culpability requirement.
Initially, Perez refers to this Court's decisions in Jackson v. State, 575 So.2d 181 (Fla.1991), and Benedith v. State, 717 So.2d 472 (Fla.1998). These cases are distinguishable from the instant case. In Jackson, there was no evidence presented at trial that placed the defendant, Clinton Jackson, at the scene of the crime. See Jackson, 575 So.2d at 184-86. In Jackson, Clinton "denied any involvement in or knowledge of the shooting." Id. at 184. No fingerprints of Clinton's were found at the crime scene and gunpowder residue tests proved inconclusive. See id. at 185. The only evidence presented that connected Clinton with the crime was the testimony of two inmates. One inmate testified that he saw Clinton driving a truck in the vicinity of the crime scene that was identified as a vehicle seen fleeing the crime scene, and that Clinton told him several days before the crime of his intentions to rob the store where the murder took place. The second inmate testified that he overheard Clinton tell his mother: "[W]e had to do it because he had bucked the jack," and "to tell Nate, [the defendant's brother,] if they picked up Nate, to tell him that he hadn't  he hadn't been nowhere around the hardware store and get rid of the gun." Id. at 185. In reversing the death penalty this Court noted:
There was no evidence that [Clinton] carried a weapon or intended to harm *370 anybody when he walked into the store, or that he expected violence to erupt during the robbery. There was no real opportunity for [Clinton] to prevent the murder since the crime took only seconds to occur, and the sudden, single gunshot was a reflexive reaction to the victim's resistance.
Id. at 192-93.
Here, unlike Jackson, Perez's own statement directly placed him at the scene of the crime, a bloody shoeprint next to the body was determined to match shoes that Perez was known to be wearing at the time of the crime, and he admitted to disposing of his shoes on the night of the crime because there was blood on them. Also, there was sufficient planning to cut Martin's phone lines and disable security lights, and there was evidence that Perez was armed with his knife that he carried home from work on occasions. Perez admitted that he helped dispose of the murder weapon and other evidence from the crime and he pawned items taken during the crime. The deadly attack here involved inflicting a blunt force trauma followed by the delivery of ninety-four stab wounds, which is a far cry from the single gunshot resulting from the reflexive reaction that was present in Jackson.
The facts revealed in Jackson v. State, 502 So.2d 409 (Fla.1986), in which we affirmed the death sentence for Clinton Jackson's brother, Nathaniel, based on the same crime at issue in Clinton's case is more relevant to our analysis of Perez's sentence in the instant matter. The significant difference between Clinton Jackson's case and Nathaniel Jackson's is found in the facts that Nathaniel's fingerprints were discovered at the crime scene (similar to Perez's footprint), and the admission at trial of a statement made by Nathaniel in which he admitted being present at the robbery but alleged that it was his brother, Clinton, who actually shot the victim (similar to Perez's statement to the police in the instance case). We conclude that Nathaniel Jackson's case is more analogous to the facts here and provides support for the trial court's finding that the culpability required by Enmund and Tison was established beyond a reasonable doubt by the evidence presented at trial.
The facts of Benedith v. State, 717 So.2d 472 (Fla.1998), are also distinguishable from the present case. In Benedith, the only eyewitness testimony at trial placed Benedith at the location of the murder four to five minutes prior to the eyewitness hearing gunshots. See id. at 474. The eyewitness further noted that immediately after hearing the gunshots, he looked in the direction of where the sound originated and saw the victim's body lying on the ground and Benedith's codefendant, Taylor, quickly entering a car and speeding away. See id. In our opinion, we specifically noted that the eyewitness did not testify to seeing Benedith in the area from which the gunshots originated after the eyewitness heard the shots and looked in that direction. See id. There simply was no evidence presented at trial that Benedith was present at the actual time of the murder. In the instant case by contrast, Perez's own statement placed him at the crime scene during the commission of the murder. Moreover, the facts of the present case with regard to Martin's phone lines being cut, a security light disabled, and Perez knowing Martin was awake watching television when he entered the house and would recognize him all demonstrate a higher level of culpability on the part of Perez than was present in Benedith.
Perez's reliance on the Supreme Court of Mississippi's decision in White v. State, 532 So.2d 1207 (Miss.1988), is similarly misplaced. White applied the Enmund *371 standard prior to the High Court's opinion in Tison, and accordingly determined that the death sentence "may be upheld only if we have before us a record which contains evidence legally sufficient that the jury may have found that Willie Lee White, Jr., killed, attempted to kill, intended that a killing take place, or contemplated that lethal force would be employed." Id. at 1219 (emphasis supplied). This majority opinion does not even mention the "major participant" and "reckless indifference" standards enunciated in Tison. Perez's reliance on other state court cases is also misplaced. See State v. Lacy, 187 Ariz. 340, 929 P.2d 1288 (1996) (holding Enmund/Tison not satisfied by "mere presence" during homicide); State v. Rodriguez, 656 A.2d 262 (Del.1994) (reversing death sentence under standard requiring a showing of a "fully-formed conscious purpose to kill" and where there was no evidence that defendant expected violence).
By recommending that Perez be sentenced to death, the jury in the present case found that "Perez was a major participant in the crime of robbery or burglary and that Daniel Perez' state of mind at that time amounted to a wreckless [sic] indifference to human life." Moreover, the trial court's sentencing order included a detailed and thorough analysis of the evidence presented at trial that supported its finding that Perez was a major participant in the burglary and robbery and acted with a reckless indifference to human life.[7]
*372 Based on the foregoing, we conclude that the trial court's finding that the Enmund/Tison culpability requirement was established by the State at trial beyond a reasonable doubt is supported by competent, substantial evidence in the record, thereby justifying a sentence of death.

II. Mitigating Circumstances

A. Statutory Mitigation
A trial court's decision with regard to the weight to be assigned to a mitigating circumstance that it determines has been established is "within the trial court's discretion, and its decision is subject to the abuse-of-discretion standard." Kearse v. State, 770 So.2d 1119, 1133 (Fla. 2000); see also Trease, 768 So.2d at 1055; Cole v. State, 701 So.2d 845, 852 (Fla.1997). Under the abuse of discretion standard, a trial court's ruling will be upheld unless the "judicial action is arbitrary, fanciful, or unreasonable, . . . discretion is abused only where no reasonable [person] would take the view adopted by the trial court." Trease, 768 So.2d at 1053 n. 2 (alteration in original) (quoting Huff v. State, 569 So.2d 1247, 1249 (Fla.1990)).
Perez asserts that the trial court abused its discretion when it assigned little weight to the statutory mitigating circumstance that the crime at issue here was committed while Perez was under the influence of extreme mental or emotional disturbance. In its assessment of this statutory mitigator, the trial court noted the largely convergent views of the defense and State mental health experts with regard to the mental conditions suffered by Perez. Namely, both mental health experts agreed that Perez suffered from bipolar and borderline personality disorder. The expert for the State, however, noted that he would add to the defense expert's diagnosis that Perez was also suffering from antisocial personality disorder.
On the basis of this evidence, the trial court concluded:
The Court is reasonably convinced from the evidence that at the time of Susan Martin's murder Daniel Perez was under the influence of extreme mental or emotional disturbance. However, the mental or emotional disturbance Perez suffered from is one of the most dangerous types. The most significant and disturbing components of Perez's bipolar disorder is the antisocial and borderline personality features. The indifference to hurting others and the willingness to violate the rights of others to get what one wants are a deadly combination....
... There was no evidence presented in this case that Daniel Perez is not able to conform his conduct to the requirements of the law. Thus, while the Court finds that the mitigating circumstance of Daniel Perez participating in a murder while he was under extreme mental or emotional disturbance has been adequately *373 proven, the Court gives little weight to this mitigating circumstance because there is no showing that Perez is unable to conform his behavior to the requirements of law and because the antisocial personality and borderline personality features of Perez's bipolar disorder make him dangerous.
Perez analogizes the trial court's logic in the instant case to the logic condemned by this Court in Mines v. State, 390 So.2d 332 (Fla.1980). A review of Mines, however, demonstrates that it is distinguishable from the present case. In Mines, we determined that the trial court abused its discretion in sentencing the defendant to death when it refused to even consider the statutory mitigating factors concerning the defendant's mental condition simply because the expert testimony established that the defendant was legally sane. See id. at 337. Unlike Mines, the trial court in the instant case specifically acknowledged and weighed the fact that Perez was under the influence of an extreme mental or emotional disturbance at the time of the crime. Therefore, Mines is distinguishable from the instant matter.
Perez also asserts that the trial court improperly distinguished cases cited by the defense for the proposition that extreme mental or emotional disturbance is one of the weightiest mitigating circumstances. The trial court determined that Rose v. State, 675 So.2d 567 (Fla.1996), Hildwin v. Dugger, 654 So.2d 107 (Fla. 1995), and Santos v. State, 629 So.2d 838 (Fla.1994), were distinguishable because they involved a finding that the defendant was unable to conform his conduct to the requirements of the law, which was absent in the instant case. While this trio of cases does suggest that the mental or emotional disturbance mitigating circumstance is of the most "weighty order," Rose, 675 So.2d at 573, none suggests that a trial court is required to assign any certain weight to the mitigating circumstance in the abstract if it is found to exist without reference or a nexus to the particular defendant.
Further, all of the cases are distinguishable for reasons in addition to those expressed by the trial court. Rose and Hildwin both addressed ineffective assistance of counsel claims for failure to investigate and present evidence surrounding this mitigating circumstance, see Rose, 675 So.2d at 573-74; Hildwin, 654 So.2d at 110, and in Santos we merely determined that the trial court abused its discretion when it determined that this mitigating circumstance was not supported by the evidence even though the State had conceded that it existed. See Santos, 629 So.2d at 840. None of these cases addressed the weight to be assigned to this mitigator if found to exist. Moreover, we have not been inclined to find error in other cases where this mitigating circumstance has been given little weight in the trial court's sentencing order. See Dennis v. State, 817 So.2d 741 (Fla.2002); Howell v. State, 707 So.2d 674 (Fla.1998); Pooler v. State, 704 So.2d 1375 (Fla.1997).
Perez also challenges that which he perceives as the trial court discounting the weight assigned to the extreme mental or emotional disturbance mitigating circumstance based in part on its finding that the "inability to conform" mitigating factor had not also been established. Although we deem it unnecessary to address the merits of this claim based on our ultimate disposition of this case, we write to remind the trial court below that each mitigating circumstance is to be analyzed and weighed individually and that the written findings chronicling the trial court's analysis and reasons for the weight assigned by it should be "unmistakably clear" to ensure that a defendant is afforded a full appellate *374 review in cases where the ultimate sentence is death. See Peterka v. State, 640 So.2d 59, 70 (Fla.1994).
Based on the foregoing analysis, we conclude that the trial court's finding that the extreme mental or emotional disturbance statutory mitigating circumstance was established is supported by competent, substantial evidence. Additionally, we hold that the trial court's assignment of little weight to this mitigating circumstance did not amount to an abuse of its discretion, and we deny Perez's claim.
Perez next challenges the trial court's finding that his ability to conform his conduct to the requirements of the law was not impaired. A trial court's finding that a mitigating circumstance has not been established should be upheld if there is competent, substantial evidence supporting that finding. See Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990) (holding that a trial court's finding that a mitigating circumstance is not established should be upheld so long as there is competent and substantial evidence supporting that finding); Kight v. State, 512 So.2d 922, 933 (Fla.1987) (same). Initially, Perez relies on this Court's opinion in Stewart v. State, 558 So.2d 416 (Fla.1990), as support for this argument. In Stewart, this Court determined that the failure of the trial judge to instruct the jury on the impaired capacity mitigating circumstance constituted reversible error when there was evidence presented with regard to that circumstance and the instruction was requested. See id. at 420-21. The record in the present case demonstrates that the trial judge followed the law as announced in Stewart and instructed the jury on the "inability to conform" mitigating circumstance. Therefore, we conclude that the trial court's actions did not violate the rule established in Stewart and that Perez's claim has no merit.
Perez also contends that the trial judge rejected the "inability to conform" mitigating circumstance based on the erroneous view that there must be specific testimony describing the mitigating circumstance which uses the precise statutory language. However, the trial court's sentencing order does not recite this premise as the basis for the rejection of this mitigating circumstance. Rather, the trial court merely stated that although the defense mental health expert, Dr. Riordan, "opined that Daniel Perez was acting under extreme mental and emotional disturbance," the doctor "offered no evidence that the capacity of Daniel Perez to appreciate the criminality of his conduct or to confirm his conduct to the requirements of the law was substantially impaired." Additionally, the trial court noted that there was "no evidence of such impairment in the record." Based on the foregoing, we conclude that Perez's claim regarding the basis for the trial court's rejection of this mitigating circumstance is not supported by the record.
Moreover, the record demonstrates competent and substantial evidence in support of the trial court's finding that the mitigating circumstance with regard to the inability to conform conduct to the requirements of the law was not established. Neither mental health expert testified whether this mitigating circumstance was applicable in Perez's case. Moreover, Dr. Riordan's report, which was admitted into evidence at the Spencer hearing, contained the following statements:
While [Perez's] disorders are believed to have been present at the time of his alleged offenses, these disorders are not, however, believed to have caused him not to know that the acts involved in the alleged offenses ... were wrong, not to appreciate what he was doing and not *375 appreciate the consequences of his actions. While the defendant was found to be suffering from mental infirmity, his infirmity was not found to have caused him to commit his alleged offenses.... As a result of his mental infirmities, however, he was not found to be under such a defect of the mind so as he was unable to distinguish right from wrong, appreciate what he was doing, not know that what he was doing was wrong and not fully appreciate the consequences of his actions.
Given the lack of testimony in support of this mitigating factor and the statements contained in the defense mental health expert's report negating its existence, we conclude that the trial court's finding that this mitigating circumstance was not established is supported by competent, substantial evidence and therefore was not improper. Accordingly, Perez's claim is denied. See Nibert, 574 So.2d at 1062; Kight, 512 So.2d at 933.

B. NonStatutory Mitigation
Perez also contends that the trial court abused its discretion when it assigned little weight to the nonstatutory mitigating circumstances of his bad upbringing and sexual abuse based on the conclusion that these aspects of Perez's life "contributed to a combination of antisocial personality features and borderline personality features which [had] coalesced over time into a conduct disorder that now makes Daniel Perez a dangerous person." Perez asserts that it was improper for the trial court to essentially utilize his disorder as "anti-mitigation" to reduce the weight of the nonstatutory mitigating circumstances the trial court found existed.
As support, Perez relies on this Court's opinion in Miller v. State, 373 So.2d 882 (Fla.1979). In Miller, this Court vacated the trial court's sentence of death where it "considered as an aggravating factor the defendant's allegedly incurable and dangerous mental illness." Id. at 885 (emphasis supplied). Although the trial court in Miller properly conducted its individual analysis of aggravating and mitigating circumstances, we determined that in the final weighing of the mitigating and aggravating circumstances established, the trial court's "use of this nonstatutory aggravating factor as a controlling circumstance tipping the balance in favor of the death penalty was improper." Id. Miller is distinguishable from the instant case. In the present case, the trial court merely properly evaluated Perez's mental condition in its assessment of the weight to be assigned to the nonstatutory mitigation, not in determining that aggravating circumstances were present to justify a sentence of death. Thus, under Miller, the trial court's actions do not constitute an abuse of discretion. Cf. Sanchez-Velasco v. State, 570 So.2d 908, 916 (Fla.1990) (rejecting defendant's claim that trial court improperly used a nonstatutory aggravating circumstance when it commented on defendant's "evil mind, superego, and tendency to lash out others" in its discussion of the reason it found that certain mitigating factors had not been established and where the trial court did not make a finding that the death penalty was required to protect the public based on defendant's "dangerous mental state").
Although a trial court may not use evidence of a defendant's mental illness and a resulting propensity to commit violent acts in the future as aggravating factors to tip the scales in favor of death, see Miller, 373 So.2d at 885-86, a trial court's use of a defendant's mental condition in the evaluation of the weight to be afforded a nonstatutory mitigating circumstance found to exist has not been specifically rejected by this Court. Here, the trial *376 court accorded little weight to these nonstatutory mitigating circumstances by noting that they "contributed to a combination of antisocial personality features and borderline personality features which have coalesced over time into a conduct disorder that now makes Daniel Perez a dangerous person." While the trial court did not use Perez's mental condition as a nonstatutory aggravating circumstance, a practice condemned by Miller, the sentencing order does seem to imply that the trial court considered Perez's potential for future dangerousness in the weighing process. The trial court's statement here was clearly made in its assessment of the weight to be accorded a nonstatutory mitigating circumstance. Moreover, the sentencing order reveals that Perez's mental conditions were in fact considered by the trial court in its analysis of statutory mitigation. Given the deference a trial court's determination of the weight to be assigned to mitigating circumstances is afforded, see Trease, 768 So.2d at 1053 n. 2, we conclude that the trial court below did not abuse its discretion when it assigned little weight to these nonstatutory mitigating circumstances because we cannot conclude that "no reasonable person would [have] give[n] this circumstance [little] weight." Elledge v. State, 706 So.2d 1340, 1347 (Fla.1997).
Walker v. State, 707 So.2d 300 (Fla. 1997), upon which Perez also relies, is similarly distinguishable from the case at bar. In Walker, this Court held that it was improper for the State to interject the probability of recurring violent acts by the defendant in the future, noting that such a fact is "not a proper aggravating circumstance." Id. at 314.[8] Although the Court found that these comments were harmless, the Court reiterated its holding in Miller that it is improper to "attach aggravating labels to factors that actually should militate in favor of a lesser penaltylike ... the defendant's mental impairment." Id. The facts of Walker are entirely distinguishable from the facts of the instant case because here the State in fact conceded that Perez's mental conditions were mitigating, and the trial court indeed considered them as such. Based on the foregoing, we deny Perez's claim.

III. Victim Impact Evidence
Perez contends that the trial court erred when it refused to allow the defense to present evidence that Martin and the entire family opposed the death penalty. This claim is meritless. Section 921.141(7) of the Florida Statutes (2001) provides:
Once the prosecution has provided evidence of the existence of one or more aggravating circumstances as described in subsection (5), the prosecution may introduce, and subsequently argue, victim impact evidence. Such evidence shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence.

§ 921.141(7), Fla. Stat. (2001) (emphasis supplied). This Court has expressly held that witness testimony during the presentation of victim impact evidence should not include testimony with regard to witnesses' opposition to the death penalty. See Floyd v. State, 569 So.2d 1225, 1230 (Fla.1990) (holding trial court did not abuse its discretion when it prevented victim's daughter from testifying to her preference that defendant should not receive *377 the death penalty); see also Card v. State, 803 So.2d 613 (Fla.2001) (noting witness's testimony concerning proper punishment was outside the bounds of proper impact evidence).[9]

IV. Constitutionality of Florida's Death Penalty
Perez asserts that Florida's capital sentencing scheme violates his Sixth Amendment right and his right to due process under the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court addressed the contention that Florida's capital sentencing scheme violates the United States Constitution under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring, in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002), and denied relief. See also Jones v. State, 845 So.2d 55, 74 (Fla.2003). Perez is likewise not entitled to relief on this claim. Furthermore, one of the aggravating circumstances found by the trial court in this case was a prior conviction of a violent felony, "a factor which under Apprendi and Ring need not be found by the jury." Jones v. State, 855 So.2d 611, 619 (Fla. 2003); see also Doorbal v. State, 837 So.2d 940, 963 (Fla.) (rejecting Ring claim where one of the aggravating circumstances found by the trial judge was defendant's prior conviction for a violent felony), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003).
Perez's assertion that Florida's death sentencing scheme is unconstitutional pursuant to the Eight Amendment and Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), has not been preserved for review. A review of the record demonstrates that the specific grounds asserted by Perez in his claim before this Court were not presented in the trial court below. See Steinhorst, 412 So.2d at 338 ("[I]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below."). Procedural bar notwithstanding, Perez's assertion is meritless. See Proffitt v. Florida, 428 U.S. 242, 251, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (holding that Florida's capital sentencing scheme does not violate the Eighth Amendment as interpreted by Furman).[10]

V. Aggravating Circumstances
In sentencing Perez to death, the trial court found that the following aggravating circumstances were established: (1) Perez had previously been convicted of a another capital felony or a felony involving a threat of violence to the person; (2) Perez committed the murder in this case while he was engaged, or was an accomplice, in the commission of, or an attempt to commit or in flight after committing or attempting to commit a robbery or a burglary of a dwelling; (3) the murder was committed for pecuniary gain; and (4) the murder was committed in an especially heinous, atrocious, or cruel fashion.[11] Perez *378 asserts that the trial court erred in finding that the evidence presented supported the application of the HAC aggravating circumstance. We outlined the standard for evaluating a trial court's finding of an aggravating circumstance in Willacy v. State, 696 So.2d 693 (Fla.1997):
[I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt  that is the trial court's job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Id. at 695 (footnote omitted).
The trial court's sentencing order outlined the evidence that it considered in finding that HAC applied to Martin's murder:
The evidence at trial presented by the medical examiner proved beyond a reasonable doubt that Susan Martin was stabbed to death. Altogether she was stabbed ninety-four times. There were eight stab wounds to the left side of her neck, four of which cut her jugular vein. There were twenty-four stab wounds to the right side of her abdomen, some of which were lethal because they cut her liver and her right lung. There were twenty stab wounds to the left side of her abdomen, some of which were lethal because they cut her left lung. There were twenty four stab wounds on the backside of her abdomen and eighteen stab wounds on the front side of her abdomen. There was one defensive wound to a finger on her left hand. She also sustained a blunt trauma injury over her left eye causing a V-shaped laceration and bruising and there were scratches on her neck. The blow to her head did not cause brain damage or skull fracture and was not a fatal blow. The bruising on her forehead and the hemorrhaging to her right lung cavity showed she was still alive at the time she was hit on the head and her right lung was punctured.
The medical examiner could not conclude with a reasonable degree of certainty what was the sequence of the stab wounds, but more likely than not the stab wounds to the neck and the right abdomen were inflicted first, given where the blood went as Susan Martin died. As to the fatal stab wounds to the neck, the medical examiner concluded that she would have lost consciousness within a matter of a few seconds to as much as two minutes. As to the stab wounds to the right abdomen Susan Martin could have lived as long as fifteen minutes. In his statements to law enforcement, Perez admitted to hearing Susan Martin gurgling in her blood.
Based on the medical evidence and the defensive wound to Susan Martin's hand, as well as the admissions by Perez, the Court finds beyond a reasonable doubt that Susan Martin was alive and conscious during some of the multiple stab wounds, and the State has proven beyond a reasonable doubt that her murder was unnecessarily torturous, conscienceless, and pitiless. Davis v. State, 620 So.2d 152 (Fla.1993); Pittman v. State, 646 So.2d 167 (Fla.1994); Francis v. State, 808 So.2d 110 (Fla.2002).
The evidence presented at trial through the admission of the medical examiner's testimony and Perez's statement to the police supports the above findings of the trial court and the trial court's conclusion that Martin's murder was carried out in a heinous, atrocious, or cruel manner.
Perez contends that HAC is inapplicable because there was evidence that Martin *379 lost consciousness quickly and therefore the prolonged suffering associated with HAC is not present in this case. Perez further asserts that even if Martin was conscious during some of the stab wounds HAC is still not applicable. As support, Perez directs our attention to Elam v. State, 636 So.2d 1312 (Fla.1994), in which we struck the trial court's application of HAC to a bludgeoning murder where,
[a]lthough the defendant was bludgeoned and had defensive wounds, the medical examiner testified that the attack took place in a very short period of time ("could have been less than a minute, maybe even half a minute"), the defendant was unconscious at the end of this period, and never regained consciousness.
Id. at 1314. Elam is clearly distinguishable from the instant case. Here the evidence established that Martin was stabbed no fewer than ninety-four times and also suffered defensive wounds and blunt force trauma to the head. Moreover, the outer bounds of consciousness established by the medical testimony in the instant case exceeded that established in Elam. The other cases relied on by Perez are similarly inapposite. Cf. Zakrzewski v. State, 717 So.2d 488, 493 (Fla.1998) (holding HAC inapplicable where evidence established that the victim "may have been rendered unconscious upon receiving the first blow from the crowbar, and as a result she was unaware of her impending death"); Rhodes v. State, 547 So.2d 1201 (Fla.1989) (holding HAC inapplicable in strangulation murder where evidence indicated that victim was likely semiconscious at the beginning of the attack).
We have repeatedly upheld the HAC aggravating circumstance in cases where the victim has been viciously stabbed numerous times. See, e.g., Guzman v. State, 721 So.2d 1155, 1159-60 (Fla.1998); Mahn v. State, 714 So.2d 391, 399 (Fla.1998); Rolling v. State, 695 So.2d 278, 296 (Fla. 1997); Williamson v. State, 681 So.2d 688, 698 (Fla.1996); Finney v. State, 660 So.2d 674, 685 (Fla.1995); Barwick v. State, 660 So.2d 685, 696 (Fla.1995); Pittman v. State, 646 So.2d 167, 173 (Fla.1994); Hardwick v. State, 521 So.2d 1071, 1076 (Fla. 1988); Nibert v. State, 508 So.2d 1, 4 (Fla. 1987); Johnston v. State, 497 So.2d 863, 871 (Fla.1986); Peavy v. State, 442 So.2d 200, 202 (Fla.1983). In Francis v. State, 808 So.2d 110, 134-35 (Fla.2002), this Court noted that it has upheld the application of HAC even when the "medical examiner determined that the victim was conscious for merely seconds." Id. at 135. In Rolling, we upheld the application of the HAC aggravating circumstance even when the medical examiner testified that the "victim would have remained alive for a period of thirty to sixty seconds." Rolling, 695 So.2d at 296. Additionally, in Peavy the Court determined that the application of HAC was not improper when the medical examiner testified the victim would have lost consciousness within seconds. See 442 So.2d at 202-03. Based on the evidence presented and detailed in the trial court's sentencing order, we conclude that there was competent, substantial evidence supporting the trial court's finding that HAC applied to the murder of Martin. Moreover, the trial court here applied the correct rule of law when it read the standard jury instruction on the HAC aggravator. See Cave v. State, 727 So.2d 227, 229 (Fla.1998) (finding that trial court applied the correct rule of law in a felony murder case where it gave the standard jury instruction on HAC). Given the above analysis, we determine that the evidence supports the trial court's finding of HAC in the instant matter.
In addition to the above assertions, Perez also contends that there was a *380 lack of competent and substantial evidence to support the trial court's finding that the HAC aggravating circumstance could be applied to him. We agree with Perez that the trial court improperly found the HAC aggravator applicable to him. In Omelus v. State, 584 So.2d 563 (Fla.1991), this Court reversed a trial court's sentence of death and remanded for resentencing in a felony murder case where there was no evidence
that Omelus knew how Jones would carry out the murder of Mitchell, and, . . . no evidence to show that Omelus directed Jones to kill Mitchell in the manner in which this murder was accomplished. Under these circumstances, where there is no evidence of knowledge of how the murder would be accomplished, we find that the heinous, atrocious, or cruel aggravating factor cannot be applied vicariously.
Id. at 566. Again, in Williams v. State, 622 So.2d 456 (Fla.1993), this Court determined that HAC "cannot be applied vicariously, absent a showing by the State that the defendant directed or knew how the victim would be killed." Id. at 463. In Archer v. State, 613 So.2d 446 (Fla.1993), we determined that "a defendant who arranges for a killing but who is not present and who does not know how the murder will be accomplished cannot be subjected vicariously to the heinous, atrocious, or cruel aggravator." Id. at 448 (emphasis supplied).
The State asserts that Perez's case is distinguishable from Archer and other cases applying Omelus because Perez was present at the scene of the murder. Initially, we note that the language quoted above from Archer, alluding to the defendant not being present, merely refers to the facts that were before the Court in Archer. This language in Archer was not intended to modify the standard with regard to "directing or knowing" that the Court announced in Omelus to only apply to those defendants who were not present at the scene. The State also relies on two of our previous opinions in which we upheld the vicarious application of HAC to defendants found guilty of felony murder. See Cave v. State, 727 So.2d 227 (Fla.1998); Copeland v. State, 457 So.2d 1012 (Fla. 1984). However, a review of the facts in those cases cited by the State reveals that the conduct by the defendant in each case was more culpable than the only conduct established by the record in the instant matter on the part of Perez. For example, in Cave, this Court upheld the application of HAC where the trial court found that the
Defendant personally removed the victim from the convenience store at gun point, placed her in the back seat of the car in which he and a co-defendant were seated, heard her pleas for her life during a fifteen to eighteen minute ride to an isolated area, removed her from the car and turned her over to Bush and Parker who stabbed and then shot her. At some point her panties were wet with urine. The terror she experienced must have been horrible and meets the definition of especially heinous, atrocious and cruel.
727 So.2d. at 229. Copeland v. State, the second case to which the State refers, is also inapplicable to the instant matter. Initially, Copeland was decided seven years before our decision in Omelus. Moreover, in affirming the trial court's application of HAC to the defendant in Copeland, we noted that the defendant was an equal participant in the hours-long ordeal that involved the defendant initially confronting the victim at gunpoint, the kidnapping of the victim, and ending with her eventual rape and execution-style murder carried out with the defendant's gun. See 457 So.2d at 1015, 1019. Based on the *381 foregoing, we conclude that these cases are distinguishable from the instant matter because they all involved conduct on the part of the defendant that established a significantly higher level of culpability than that which is attributable to Perez here and, therefore, do not support the application of the HAC aggravator to Perez.
Additionally, the lack of any indication by the trial court in its sentencing order indicating that the trial court even considered the law as outlined by Omelus and its progeny gives us great concern with regard to whether the trial court appropriately applied this aggravating circumstance to Perez. In its sentencing order finding HAC applicable to Perez, the trial court merely stated that
[b]ased on the medical evidence presented and the defensive wound to Susan Martin's hand, as well as the admissions by Perez, the Court finds beyond a reasonable doubt that Susan Martin was alive and conscious during some of the multiple stab wounds, and ... that her murder was unnecessarily torturous, conscienceless, and pitiless.
However, the only eyewitness evidence presented at trial was the statement of Perez in which he never admitted striking Martin, and he consistently stated that Green committed the murder of his own accord and without prior discussion with or notice to Perez. Given the trial court's failure to make the findings required by Omelus to apply the HAC aggravator vicariously to Perez, and the lack of any evidence establishing that Perez directed or otherwise knew that Martin would be killed or the manner of death, we conclude that the trial court erred in applying the HAC aggravator to Perez. Although the record clearly demonstrates that the manner in which Susan Martin was murdered may qualify as HAC under our previous case law, we conclude that the evidence does not support the application of that aggravating circumstance vicariously to Perez under the only evidence in this record.
Given our conclusion that HAC was erroneously applied to Perez, we must now determine whether resentencing is required or if the error was harmless and the death penalty still appropriate based on the remaining valid aggravating and mitigating circumstances. See Hill v. State, 643 So.2d 1071, 1073 (Fla.1994) ("When this Court strikes one or more aggravating circumstances relied upon by a trial judge in sentencing a defendant to death, we may conduct a harmless error analysis based on what the sentencer actually found in determining whether the sentence of death is still appropriate."). Under this analysis we are required to determine whether there is any reasonable probability that the trial court's error in applying HAC to Perez contributed to the sentence of death entered in this case. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986). With the striking of the HAC aggravator, two aggravating circumstances remain  prior violent felony conviction, see § 921.141(5)(b), Fla. Stat (2001); and the merged aggravators of commission while engaged, or an accomplice, in the commission of, or an attempt to commit or in flight after committing or attempting to commit a robbery or a burglary of a dwelling, see § 921.141(5)(d), Fla. Stat. (2001), and commission for pecuniary gain, see § 921.141(5)(f), Fla. Stat. (2001). The trial court also found that one statutory mitigating circumstance had been established, extreme mental or emotional disturbance, see § 921.141(6)(b), Fla. Stat. (2001), along with fourteen nonstatutory mitigating factors. See supra note 3. Given the State's emphasis on the heinous, atrocious, or cruel aggravating factor during the sentencing phase before the jury and the fact that the trial court *382 found one statutory mitigating factor along with fourteen nonstatutory mitigators, we cannot say that the consideration by the jury and the trial judge of this aggravating factor was harmless beyond a reasonable doubt. The dissent contends that all that is necessary in this case is for the Court to remand the instant matter for a new sentencing proceeding before the trial judge. See concurring in part and dissenting in part op. at 383. However, given the significant weight that has historically been accorded to the HAC aggravator, see Morton v. State, 789 So.2d 324, 331 (Fla.2001) ("CCP and HAC . . . `are two of the most serious aggravators set out in the statutory sentencing scheme.'") (quoting Larkins v. State, 739 So.2d 90, 95 (Fla.1999)), we conclude that a new penalty phase proceeding is required because we cannot say beyond a reasonable doubt that the penalty phase jury's improper consideration of the HAC aggravator did not contribute to the recommended sentence of death. For the reasons stated herein, we affirm Perez's convictions, reverse the sentence of death, and remand this case for a new penalty phase proceeding.[12]
It is so ordered.
PARIENTE, C.J., and LEWIS, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., concurs specially with an opinion, in which ANSTEAD, J., concurs.
WELLS, J., concurs in part and dissents in part with an opinion, in which QUINCE, J., concurs.
ANSTEAD, J., concurs in result only with an opinion.
PARIENTE, C.J., concurring specially.
I agree that a new penalty phase is required in this case. I would go further and caution the trial court on remand against discounting Perez's mitigation based on mental illness and victimization by sexual abuse as a child on grounds that these factors make him dangerous. In its sentencing order, the trial court assigned little weight to both the statutory mitigator of extreme mental or emotional disturbance and the nonstatutory mitigator of sexual victimization as a child on grounds that Perez's background and personality disorders make him a dangerous person. Because future dangerousness is a prohibited nonstatutory aggravating circumstance, the trial court should not factor this determination into its assessment of the weight assigned to these mitigating circumstances on remand.
A sentencing court is limited to the statutory aggravating circumstances listed in section 921.141(5), Florida Statutes. See Miller v. State, 373 So.2d 882, 885 (Fla. 1979). Future dangerousness is not on the list. We have stated that we "must guard against any unauthorized aggravating factor going into the equation which might tip the scales of the weighing process in favor of death." Elledge v. State, 346 So.2d 998, 1003 (Fla.1977). By factoring future dangerousness into the weight given a mitigating factor, the sentencing court runs the risk of converting mitigation into prohibited nonstatutory aggravation.
Mitigating factors weigh against imposition of death because they reduce or extenuate an offender's moral culpability for the crime. See Merck v. State, 763 So.2d 295, 298 (Fla.2000); Wickham v. State, 593 So.2d 191, 194 (Fla.1991). If a mental *383 illness or childhood trauma makes a defendant dangerous, that dangerousness should not detract from the weight given to the mitigating factor. On the contrary, the fact that an immutable aspect of the defendant's character or background has contributed to making him or her dangerous is precisely why the factor mitigates responsibility in the calculus of capital punishment. In our recent decision reversing a death sentence on proportionality grounds in Crook v. State, 908 So.2d 350, 358-59 (Fla.2005), we noted that mental health testimony related the rage and brutal conduct in the murder to the defendant's brain damage and mental deficiencies. As we stated in Crook, "our case law has consistently held that these substantial mental deficiencies merit great consideration in evaluating a defendant's culpability in a proportionality assessment." Id. at 358.
In Miller, this Court vacated a sentence of death because of improper consideration of future dangerousness in making the sentencing decision. We stated:
The legislature has not authorized consideration of the probability of recurring violent acts by the defendant if he is released on parole in the distant future. To the contrary, a large number of the statutory mitigating factors reflect a legislative determination to mitigate the death penalty in favor of a life sentence for those persons whose responsibility for their violent actions has been substantially diminished as a result of a mental illness, uncontrolled emotional state of mind, or drug abuse.
Miller, 373 So.2d at 886. The trial court's concern in Miller was that the defendant would kill again if released on parole after twenty-five years under the sentencing structure then in place. See also Norris v. State, 429 So.2d 688, 690 (Fla.1983) (stating that concern voiced by sentencing judge over possibility that defendant could be paroled someday is "an improper consideration by judge or jury"). Future dangerousness remains improper nonstatutory aggravation under the current statutory scheme in which parole is foreclosed for a sentence of life imprisonment for first-degree murder. There is even less justification for future dangerousness weighing in favor of death where the danger remains within prison walls.
Accordingly, I disagree with the majority's conclusion that the trial court's determination of future dangerousness did not taint its assessment of the weight given these mitigating factors. I would caution the trial court on remand against reducing the weight given to proven mitigation on grounds that the defendant's mental disorders or childhood trauma have made him dangerous to others.
ANSTEAD, J., concurs.
WELLS, J., concurring in part and dissenting in part.
I concur in affirming the conviction. I dissent from the determination that heinous, atrocious, or cruel (HAC) was not an aggravator. I would affirm the finding of HAC on the basis of Cave v. State, 727 So.2d 227 (Fla.1998).
Moreover, I believe that the majority errs in remanding this case for a new penalty phase. At most, there should only be a new sentencing before the trial judge.
QUINCE, J., concurs.
ANSTEAD, J., concurring in result only.
I concur in the result of the majority's holding, and I also concur in Chief Justice Pariente's observations in her separate opinion.
NOTES
[1] The language of the indictment indicates that Perez was charged with "unlawfully, with a premeditated design to effect the death of any human being," killing Martin. The indictment also charged Perez with violating section 782.04(1)(a) of the Florida Statutes, which encompasses both felony and premeditated first-degree murder. See § 782.041(1)(a), Fla. Stat. (2001).
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] The trial court found the following nonstatutory mitigating circumstances: (1) unstable upbringing and family history (little weight); (2) sexually abused as a child (little weight); (3) loving father, husband, son, and brother, and his family loves him (moderate weight); (4) long term mental health difficulties (little weight); (5) gainfully employed (moderate weight); (6) incarceration in an adult facility as a juvenile, even though the crime occurred when he was a juvenile (little weight); (7) drug addiction (little weight); (8) recipient of Boy Scout merit badges (some weight); (9) obtained GED in prison (some weight); (10) failure of jury to render unanimous verdict on premeditated murder (little weight); (11) cold, calculating and mitigating factor absent (little weight); (12) cooperation with police (little weight); (13) good attitude and conduct during trial (little weight); and (14) impact of death penalty on defendant's family (some weight). Additionally, the trial court considered the following nonstatutory mitigating circumstances but found that they had not been established by the evidence presented: (1) that Perez was remorseful; and (2) any plea agreement offer to Perez's codefendant as relevant to proportionality review.
[4] We note that Nicosia's response to a question on the juror questionnaire with regard to her position on the death penalty reflected that her view was that it was "[a]ppropriate in some cases, inappropriate in some cases."
[5] Perez's assertion that the officers held him incommunicado is refuted by the transcript of the interview, which establishes that Perez was allowed to speak with his wife in person upon request.
[6] See infra note 7, pp. 371-72 (quoting sentencing order).
[7] The trial court's sentencing order, in pertinent part, stated:

Perez admitted to law enforcement that he planned to commit a crime against Susan Martin the night she was killed, and he is the one who took himself and his co-defendant, Calvin Green, to her residence. In other words, it is Daniel Perez who selected the target of the criminal activity. The evidence further showed beyond a reasonable doubt that Susan Martin's residence was entered by stealth. The telephone lines into the home were cut and a security light which reacts to motion was unscrewed before entry was made. The evidence also showed beyond a reasonable doubt that a screen to an outside door to her garage was cut at the time of the burglary. In statements made by Daniel Perez to law enforcement, Perez admitted Susan Martin was watching an infomercial on television at the time entry was made into her home. Perez also admitted that he put socks on his hands before entering her house. Perez admitted Susan Martin was stabbed numerous times with a knife. He also admitted to helping dispose of the knife after the murder. Bloody footprints matching shoes Perez was known to wear at the time of the murder were found next to the body of Susan Martin. Perez admitted to throwing away the shoes in a dumpster the same night of the murder. Only one other identifiable bloody footprint was found at the scene of the crime in a hallway some distance away from the body, and that footprint was inadvertently made by law enforcement while the crime scene was being processed.
The evidence at trial also proved beyond a reasonable doubt that prior to being murdered, Susan Martin accused Daniel Perez of burglarizing her home and stealing from her approximately one month earlier. Perez knew prior to the date Susan Martin was murdered that she had made that accusation to law enforcement.
The evidence at trial also proved beyond a reasonable doubt that on a prior occasion Perez had used a knife to attempt to kill someone by stabbing him, and he had a personal awareness of the lethality of a knife and the high probability of danger when a knife is used to confront someone.
The evidence further showed beyond a reasonable doubt that at a minimum he knew the high probability of danger that a life was in jeopardy when he entered Susan Martin's house knowing she was awake, knowing she knew who he was, knowing that either himself or his co-defendant was armed with a knife used to cut the telephone lines and the screen, and knowing that after entry was made, she sustained a serious blow to the head by a cane.
The only evidence presented at trial which connected Perez's co-defendant, Calvin Green, to the crimes committed was Perez's statements to law enforcement. The only eyewitness version of the events presented at trial were the statements made by Perez to law enforcement, in which Perez emphatically denied being the one who stabbed Susan Martin to death. However, the description of events given by Perez changed several times as he was confronted by law enforcement with various pieces of physical evidence. The various permutations in his statements of his involvement in the crimes committed against Susan Martin do not make his final version credible.
By interrogatory responses on the verdict form, the jury unanimously decided beyond a reasonable doubt that in the course of committing the burglary, Perez made an assault or battery upon Susan Martin. The jury also unanimously decided that Perez was armed or armed himself with a deadly weapon in the course of committing the burglary. The only two deadly weapons described in the evidence were the knife used to stab Susan Martin, and the duck head cane used to strike her on the head.
[8] In Walker, the State asked the mental health expert: "Well, do you think also that [Walker] may kill again?" Walker, 707 So.2d at 314 (alteration in original).
[9] Perez's reliance on the general evidentiary rule that character evidence of the defendant may be presented by the State when the accused places his character at issue is inapposite. See Butler v. State, 842 So.2d 817, 827 (Fla.2003); Gore v. State, 784 So.2d 418, 433 (Fla.2001); Carter v. State, 687 So.2d 327 (Fla. 1st DCA 1997); Lusk v. State, 531 So.2d 1377, 1382 (Fla. 2d DCA 1988).
[10] The remaining aspect of Perez's claim implicates the Enmund/Tison analysis, see discussion supra pp. 365-72, along with the HAC question discussed infra pp. 378-82.
[11] The trial court merged the pecuniary gain and in the commission of a robbery aggravators, considering them as a single aggravating circumstance.
[12] Given our disposition of this case, it is unnecessary for us to conduct a proportionality review at this time.